In the Matter of the Judicial Settlement of the Account of Proceedings of SECURITY TRUST COMPANY OF ROCHESTER, as Executor of the Will of JOHN C. AGNEW, Deceased.

Surrogate's Court, Monroe County, May 14, 1928.

**Physicians and surgeons — claims against estate of deceased patient — claim by surgeons who rendered services to decedent without agreement as to pay — decedent availed himself of hospital charity service but subsequently returned to hospital as pay patient and was rendered services for which claims are made — claimants were not required to investigate financial status of patient — mistake as to decedent's classification — equity and good conscience require executors to recompense claimants in reasonable sum.**

This is a claim by surgeons who rendered valuable surgical services to decedent without directly making any financial arrangements with him as to payment. Decedent, without disclosing his financial worth to the hospital, availed himself of its more distinctly charitable service and subsequently returned under an agreement to pay the fixed charges for room, nursing and post-operative care of the hospital and was rendered the services for which claim is made. Since claimants mistook the decedent for a pauper, and he, in mistake, mistook them as gratuitously doing a charitable act and received at their hands through honest mistake a valuable benefit, equity and good conscience require that his executors should recompense claimants in such sum as may be hereafter determined to be the reasonable value of their services.

PROCEEDING for accounting of executor, involving claim against estate for surgical services to testator.

*Harris, Beach & Matson* [*Leonard B. Bacon* of counsel], for the executor.

*Hubbell, Taylor, Goodwin & Moser* [*C. L. Clinton* of counsel], for the claimants.

FEELY, S. From the agreed state of fact submitted herein, it appears that this testator, without disclosing to a public hospital, upon such threshold inquiry as it made, that he was worth over $400,000, somehow availed himself of the more distinctly charity service of the hospital, which, finally, in passing him from its out-patient department to its in-patient service, as such charity patient, exercised its exclusive privilege in designating from its staff two surgeons to treat him for an ailment necessitating a major operation, theretofore diagnosed in a series of observations, in the out-patient department, over a period of six months. With these staff surgeons, directly, this patient made no financial arrangement when he finally decided to submit to operation; but he then did agree with the hospital to pay, and did pay, the usual, though inadequate, fixed charge in such cases for room, nursing and post-operative care. He thereupon received valuable surgical service from the hospital at the hands of the staff as aforesaid.

* See, also, 132 Misc. 811.— [REP.

Misc. 466]        Surrogate's Court, Monroe County, May, 1928.

Upon his death, a month later, the facts as to his financial standing became known at the hospital; and the two surgeons who had operated on him then made claim against his estate for the reasonable value of their surgical services.

In those circumstances, the only question now put up to this court is whether these two surgeons can recover. Have they a legal claim against his estate?

The applicant was suffering from an ailment that is characteristic of advanced years; and he probably had been so afflicted for some time before he first went to the hospital. A week after he was first examined there, he was advised that the only remedy was surgical and radical, a perineal prostatectomy; yet he struggled along without operative treatment for six months, until, finally, his condition became such that he was forced to go back to the hospital for the operation.

It does not exactly appear how, or why, he entered the out-patient department, at the outset. Apparently, he could not have been so dressed then as to suggest wealth. The stipulation reads that " in answering *such questions as may have been put* to him· by the admitting clerk regarding his financial condition, *he did not disclose* the fact that he was financially able to pay." This statement is not positive, either as to the questioning, or as to the answering. On his initial visit the first thing was observation and diagnosis; and talk, if any, as to money matters at that time was, probably, slight or casual. If his appearance then was neither that of a wealthy man, nor evidently that of a pauper, but that of modest, middle class, or the shabby genteel, a sense of tact may have forborne to press the financial investigation with the newcomer to the point of making him state positively he had no ready means whatever. The investigation appears to have been very meagre, indeed, at this first visit; but somehow it resulted in his being classed as an out-patient. So, when he came back six months later for the operation, he was already on the record as an out-patient and was then so regarded; and then, naturally, the only things he was asked to pay for were for room, nurse and care. It was only then he decided to have the operation; and having been already classified as an out-patient, the matter of the surgeon's recompense was not talked about at all.

It seems improbable he deliberately offered himself to the hospital, at any time, as so much clinical material, merely to escape paying a private surgical fee or that he schemed to sneak by, under the pretense of being a pauper. Had his initial approach to the hospital been through introduction of an extramural physician, the matter of the surgeon's recompense would have been discussed,

as was that of the room and nursing. The stipulation somewhat broadly declares that he obtained admission to both departments with the purpose of obtaining both medical and surgical services without charge; and that he had no expectation or intention of paying for the medical and surgical services which were rendered him.

Whether he secured that service by fraud, or, rather, through mistake, the fact remains that, in one way or another, the benefit he received was more than he paid for. His contract was made with the hospital rather than with the surgeons. He agreed to pay, and did pay, just what he was asked to pay for. The original mistake was in not finding out he was able to pay more, as he should have done, or in his notion that the service was free.

This feature of mistake, in connection with the contract that was made, takes this case out of the rule, as expressed by LANDON, J., in his dissenting opinion at General Term in *City of Albany* v. *McNamara* (49 Hun, 356, 360), that " the deceased was admitted to the hospital as a poor person and there is no evidence or finding of any mistake or misrepresentation. Money or support given in pure charity cannot be recovered for upon the surmise that the charity was not worthily bestowed."

Professor Woodward, in his work on Quasi-Contract, states the rule to be that " if one, at the time of conferring a benefit upon another, confers it as a *gift*, that is, without intending thereby to establish contractual relations, it cannot afterwards be claimed that the benefit was conferred in misreliance upon a supposed contract," and restitution cannot thereafter be claimed. He cites the case of *St. Joseph's Orphan Society* v. *Wolpert* (1882, 80 Ky. 86), where the plaintiff society had supported and educated four children who were supposed, when received, to be penniless, but were afterwards discovered to have had then a small sum that they had received from their mother's estate, and some United States pension money through their father's service. There the court said: " It has been held too often to admit of doubt or discussion, that an executed gift or gratuity cannot be revoked by the donor, no matter what may have been the condition of the donee, or what charities he shall receive, or property acquire in the future, unless the donation or gratuity were the result of fraud or mistake in its execution." The court then emphasizes the fact that the plaintiff was a corporation, organized for charity, and that it could have made a contract with the guardians of these children; and then continues: " There was no mistake in the execution of these charitable donations, which do not partake of the nature of a contract to the same degree that ordinary gifts do; but the objects of this charity seem to have been less needy

than appellant supposed, and this is all we are authorized to infer from the allegations of the petition."

In *City of Albany* v. *McNamara* (117 N. Y. 168) the testatrix became an inmate of a hospital and paid it, regularly, for her room and received its receipt " in full; " but somehow the city had also paid the hospital on account of her support as a poor person, upon bills presented by the hospital containing her name, three years' support amounting to $538.28; for which the city made claim against her estate when it discovered the facts. The ruling was that a person receiving aid as a poor sick person from the officers of the poor of a city or county, in the absence of representations as to his responsibility or physical condition, incurs no liability to repay the amount expended in his or her behalf by such city or county; at least, in the absence of some application or request by him for aid or assistance more than the usual solicitation for charity which apparently needy persons make to the poor authorities. It was also there held that a presumption that a request for aid was made, by one assisted by public officers as a poor person, will not be entertained where the making of such request lies at the foundation of an alleged right to recover compensation therefor from her estate. Such request must be proved. The theory of such case seems to be that the worthy poor ordinarily have a social right to relief, which is never regarded as a loan to them by the public; and a person may be worthy, even though he may have some property, which, however, is not readily available for his immediate need, as stated above.

The point that a request was made by the patient is also urged in a Nova Scotia case (*Farrell* v. *McLaren*, 1878, 12 N. S. 75), where the attending physician, Dr. P., was asked by the patient, suffering from cancerous tongue, to have a surgical operation at the latter's own home, but the doctor replied the hospital was the better place; and said that Dr. F., the plaintiff, would operate and that he, Dr. P., would assist. The judge awarded the operating surgeon his bill of eighty dollars. Upon appeal, to meet the objection that the plaintiff as hospital surgeon had no legal cla:m on the patient, the court wrote that plaintiff contended " that while it was his duty as the house surgeon of the hospital, during his term of service, to give his professional attendance to, and perform surgical operations upon all pauper patients in the institution gratuitously, he was under no obligation to perform a difficult surgical operation on the deceased, who, having the means of paying, was allowed to enter the hospital for the express purpose of having it performed there on account of the more skillful nursing and better attendance provided there than he could possibly have

Surrogate's Court, Monroe County, May, 1928.     [Vol. 132

received in his own house,— drawing a distinction between pauper and paying patients well worthy of consideration.

" It has not been the practice of any surgeon or physician connected with the hospital, to make any charge for professional services rendered to its inmates. There appears to be but one case since that humane and useful institution has been established, in which any charge was ever made to an inmate, and that was a case in which it was expressly stipulated between the attending surgeon and the patient, who had the ability to pay, that the former was to be paid for his professional services.

" There was, it was true, no express agreement or understanding between the plaintiff and the defendant in this case, that the former was to be paid for his professional services, but there is evidence upon which an implied promise to pay may be inferred."

The court then cites *Gibbon* v. *Budd* (2 H. & C. 92), where the jury found that the plaintiff was not practicing gratuitously as a friend, as defendant claimed, but professionally, in expectation of a fee, as follows: " undoubtedly, the general understanding formerly was, that a physician practised in the expectation of an honorarium, not of a remuneration, which he could demand as a legal right. The presumption was that the practise was in this sense gratuitous. This presumption is now reversed. A physician registered under the Medical Act is, in the absence of a distinct understanding to the contrary, entitled to be paid for professional practise, if not restrained by a by-law of the College of Physicians.   * * *

" There is nothing in the evidence to lead us to the conclusion that these gentlemen, whose whole attention is entirely gratuitous, are under any personal obligation thus to devote their time and talents to the carrying on of a public institution, however benevolent in its nature; still less that they are to be expected to perform difficult and dangerous operations, requiring the highest skill and involving grave responsibility, not only without pecuniary remuneration, but without thanks.   * * *

" In this case, had the hospital not been open to the patient, who was by no means a pauper but the owner of real estate, he would, of course, have been bound, as doubtless he would have been willing, to pay for the services rendered; and since there is no rule of the institution forbidding the visiting physicians, when introducing their patients to its benefits, to charge for their services while there, as they might otherwise have done, I can see nothing to rebut the implied obligation arising upon the special circumstances of the case, to pay for the services,— arising from their performance on the one hand and acceptance on the other."

The chief judge then summed up the discussion and read for

Misc. 466]     Surrogate's Court, Monroe County, May, 1928.

affirmance on the ground that the deceased had employed Dr. P. whom, of course, he intended to pay; and that Dr. P. had called in the plaintiff, with the knowledge of the deceased. He then held that a patient could not be called upon to pay for services rendered in the hospital, unless he consented; but here there was a consent.

So it has been held that a patient is not liable to a public hospital for fees for the care received, unless there is an express or implied contract to pay for such fees. (*Homeopathic Hospital* v. *Chalmers*, 94 Misc. 600; *State Hospital* v. *Lehigh Valley Coal Co.*, 71 Penn. Super. 545.)

This claim, however, is not made by the hospital corporation, but by the surgeons on its staff, in their individual capacity. Are they, in law, the ones who conferred the benefit, and the ones, therefore, who have an equitable right to restitution or itsequivalent?

It was through this hospital corporation, at the hands of its staff surgeons, that this decedent received benefits for part of which it was mutually agreed he would pay, the rest having been overlooked by mistake. Although a very ordinary inquiry by the admitting clerk would have brought the truth to light, yet in the greatest number of applications for out-patient relief a case similar to the present would not be likely to occur. There has been, however, correctly omitted from the submitted statement of fact anything tending to show either diligence or carelessness on the part of the clerk, under the well-known rule that any such negligence does not, necessarily, bar the claim made for recompense by the one who conferred the benefit in unconscious ignorance of the truth. " No matter how close at hand the means of knowledge may be, no matter how stupid or careless the failure to ascertain the truth may be, if one confers a benefit under an honest mistake, *i. e.*, in unconscious ignorance of the truth, the retention of the benefit is ordinarily inequitable. By the weight of authority, restitution may be enforced." (Prof. Woodward, p. 15.)

The admitting clerk of the hospital, and indirectly, through the clerk, the staff surgeons also, proceeded under the mistaken notion that this patient was financially unable to pay for such surgical services as the hospital afforded. Relying upon the patient's classification as an out-patient, the staff surgeons performed the operation without intention of charging therefor and without any expectation of any recompense from the patient. Personally, these surgeons had no direct contractual relation with the patient. They did not even mistakenly suppose there was any such relation existing. They were, in no sense, taking a chance he might some day become able to, or would manage to pay them. They were

Surrogate's Court, Monroe County, May, 1928.          [Vol. 132

discharging their own duty to the hospital, and, as it happened, on one mistakenly supposed to be a charity patient.

The relation between the hospital corporation and its medical staff is clear in law. If the hospital has selected its staff with due care, the corporation, in the absence of an express contract to that effect, is under no responsibility for inability or carelessness on the part of a staff surgeon in his hospital work (*Schloendorff* v. *N. Y. Hospital*, 211 N. Y. 125); nor by reason of such appointment of medical men to its staff does the corporation assume the relation of master and servant as to third persons, whether patients or others. The staff members are neither servants nor agents of the hospital, but those individuals act in an independent employment or undertaking. (*Kellogg* v. *Church Charity Foundation*, 128 App. Div. 214.)

As regards paupers, these staff physicians and surgeons, out of the traditional charity of their profession and for the advancement of scientific knowledge and in aid of social betterment, undertake to treat gratuitously, in the hospital, those who have not the ready means to recompense any medical man who might render such services to them.

Had these claimant surgeons known this patient was well able to pay, they would have had the right, both professionally and under their arrangement with the hospital in joining its staff, to refuse to treat him gratuitously. So, between this patient and the hospital, there was an express contract; and it included part, but by reason of mistake or accident, not all of the service which he received through the hospital from its staff. He knowingly accepted this service under the mistaken idea he would not have to pay for anything more than he was asked to pay for. Not in fact a pauper, he was only mistakenly classified as such. By reason of this mistake — whether due wholly to himself, or in part chargeable to the admitting clerk, does not matter — these claimant surgeons were induced to render him valuable services which they would, probably, not have done had they known the real state of the case. It was not for them to investigate the financial status of the patient. They had the right to rely on his classification by the admitting clerk; and there is nothing to suggest they had any reason to suspect the mistake. In any aspect of the case, however, such mistake was not fatal, as stated above.

What, then, is the legal bearing of these mistaken notions of each of the parties, uncommunicated to each other respectively, on the part of the surgeons that they were operating upon a pauper, gratuitously, and on the part of the patient that he would not have to pay therefor?

In *Prince* v. *McRae* (1881, 84 N. C. 674) plaintiff, a physician, suing for medical services to defendant's intestate, admitted he had made no entry of a charge upon his books; and defendant testified that at the administration sale the plaintiff bought a horse and proposed to pay for him from his account, remarking he had not intended to charge the intestate, but seeing others present their accounts, he concluded to present his own also. A verdict and judgment for plaintiff was affirmed. The point on appeal was the trial court's refusal to instruct the jury " that if the plaintiff at the time the services were rendered did not intend to make a charge for them, he could not recover." Instead, the jury were instructed that if from the testimony they should find that the intestate employed the plaintiff, and the services were rendered without any express agreement to pay a definite sum, the law would imply a promise to pay what they were reasonably worth. The court said that any contract whatever " results from the concurrence of minds of two or more persons, and its legal consequences are not dependent upon the impressions or understandings of one alone of the parties to it. It is not what either thinks but what both agree. * * * Whether the plaintiff's services shall be deemed a gratuity or constitute a claim for compensation, must be determined by the common understanding of both parties. If they were intended to be and were accepted as a gift or act of benevolence, they cannot at the election of the plaintiff create a legal obligation to pay. But their character is not controlled by the inexpressed and revocable intentions of the plaintiff, although his purposes subsequently asserted may aid in ascertaining it."

Even though the claimant intended not to charge for his services, he may recover, under the North Carolina ruling, if the defendant is unaware of such intention. In other words, the presumption of contract, arising from acceptance of services, can be rebutted, not by evidence that the plaintiff did not intend to contract, but only by evidence of an agreement or understanding that no contractual obligation was to result. " When the law implies a promise to pay for work done and accepted, and there is no agreed price, the laborer may recover the reasonable value of his services, unless there be some agreement or understanding that nothing is to be paid." (*Thomas* v. *Thomasville Shooting Club*, 121 N. C. 238.) Conversely, where the patient did not expect to pay, it was held in *Shelton* v. *Johnson* (1874, 40 Iowa, 84) that a physician who is called to a consultation by an attending physician for his own benefit, in accordance with an agreement between the latter and his employer that the attending physician shall pay the expense

of consultation, can recover for his services from the employer under an implied contract, notwithstanding the agreement.

Following that case, it was held in *Garrey* v. *Stadler* (1886, 67 Wis. 512) that a consulting surgeon, who, at the request of the attending surgeon rendered services to a patient with his consent, may recover from the patient, upon an implied promise, the value of such services, notwithstanding an agreement between the patient and the attending surgeon that the latter should pay for such services, if the consulting surgeon did not expressly or impliedly assent to such agreement. The court then quotes the foregoing Iowa case to the effect that " Where a party, knowingly and without objection, permits another to render service for him of any kind whatever, the law implies a promise to pay what the same is reasonably worth. If the plaintiff had been called to visit defendant by one having no pretext of agency or authority to do so, and defendant had, without objection, received the services of plaintiff, the law would imply a contract to pay for them. If this is the rule where no authority whatever is conferred, why is it not also the rule where a limited authority, such as that set forth in the answer, is conferred? "

So, notwithstanding these claimant surgeons mistook the decedent for a pauper, and he mistook them as gratuitously doing a merely charitable act, he received at their hands, through honest mistake, in connection with a contract between him and the hospital, a valuable benefit which entailed a duty of restitution; and I am of opinion that in equity and good conscience his executors should recompense them in such sum as may, pursuant the stipulation to that effect, be hereafter determined to be the reasonable value thereof.

Let a decree be made and entered accordingly.