78 N.J. Super. 82 (1963)
187 A.2d 610
MICHAEL DESKOVICK AND PETER DESKOVICK, JR., PLAINTIFFS-APPELLANTS,
v.
RALPH PORZIO, EXECUTOR OF THE ESTATE OF PETER DESKOVICK, SR., DECEASED, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued November 5, 1962.
Decided January 14, 1963.
*84 Before Judges CONFORD, GAULKIN and KILKENNY.
Mr. Bertram Polow argued the cause for appellants (Mr. Louis R. Lombardino, attorney; Mr. Robert Taigman, on the brief).
Mr. Myron J. Bromberg argued the cause for respondent (Messrs. Porzio, Bromberg & Newman, attorneys; Mr. Ralph Porzio, on the brief).
The opinion of the court was delivered by CONFORD, S.J.A.D.
The issue here is one of asserted liability of the defendant executor for reimbursement of plaintiffs, sons of the decedent, for payments by them of medical and hospital expenses arising out of the father's last illness. The appeal is from a judgment of involuntary dismissal with prejudice ordered by the trial judge at the end of the case, thereby precluding consideration of the issues by a jury.
*85 Although not clearly apparent from the portion of the amended complaint set forth in the appendix, we are advised that it originally contained allegations that plaintiffs were induced to make the payments in question as a result of fraudulent misrepresentations by the father of financial inability to meet these expenses. But that contention was expressly withdrawn at the trial, and with it so much of the pretrial order as charges fraud.
Plaintiff Michael Deskovick gave the following testimony. He and his coplaintiff were two, apparently the eldest, of ten children of the decedent. The latter and his wife, a stepmother of plaintiffs, lived in a house on a tract of land which was also the site of Michael's home and business office. The father, Michael and Peter went into business together in 1934, but the sons bought out the father's interest in 1945, partly in cash and partly in deferred installments, which were still being paid at the rate of $100 per month as of the time of decedent's death, August 2, 1959.
Decedent became seriously ill and was hospitalized for two months in 1958. He returned to the hospital in the spring of 1959 and remained there until his death of cancer. Plaintiffs began to pay hospital and medical bills in August 1958, and paid some after decedent's death, as late as December 7, 1959. "Somebody" put the bills on Michael's desk from time to time "and [he] assumed them and paid them." He did not discuss the bills with his father "because [his] father was on his back. He was in a condition so that he couldn't talk." Sometimes, "you could talk to him. We always would hope that he would get better and sit down with him sometime and iron these things out, but things never improved with him * * * we didn't want to aggravate him with money problems while he was in that condition."
Over objection by defendant, Michael testified:
"Q. Did you intend to have your father repay you for these bills at a future date? A. I intended to do so somehow and in some way."
*86 In the event of the father's death, Michael's intention, when he paid the bills, "was to get the estate to pay" them. He submitted the vouchers "in some hope that I would get that."
After reservation by the court on a motion for dismissal, the defense read Michael's pretrial depositions to the jury. Therein he testified, on examination by his own counsel:
"QUESTION: You say you did have conversations with your father prior to this date  prior to the time he became ill  whereby he indicated to you that he was in a financially embarrassed position or didn't have the money? ANSWER: He always cried the blues that he was up against it, you know. That is nothing new. That went on and on all the time. We never dreamed he had this kind of money laying there. I mean, that is something we didn't expect, so we just paid the tabs and as they came in we picked it up and would take care of it. Nobody else would ever pick up a tab. They just brought them down and gave them to me."
On renewal of the motion for judgment of dismissal the court granted it, stating:
"It seems to me, based upon the deposition read into the record, that there was intended at the time of the payment by Mr. Deskovick no repayment. He was then under the impression that his father didn't have any money, so he could not have intended to get repayment."
If the question whether plaintiffs intended to be repaid at the time they advanced the moneys in question were the sole material issue, we would conclude the trial court erred in taking the case out of the jury's hands. While the weight of the credible evidence accorded with the judge's stated view, we cannot say that the proofs contra were of such insignificance as to have made the issue one of law. However, insofar as the theory of plaintiffs' case was based on implied contract, their intention to be repaid was immaterial in the factual situation presented, for the following reasons.
It is elementary that the assertion of a contract implied in fact calls for the establishment of a consensual understanding *87 as to compensation or reimbursement inferable from the circumstances under which one furnishes services or property and another accepts such advances. West Caldwell v. Caldwell, 26 N.J. 9, 29 (1958); Disbrow v. Durand, 54 N.J.L. 343 (E. & A. 1892); Steffler v. Schroeder, 12 N.J. Super. 243, 247 (App. Div. 1951); Shapiro v. Solomon, 42 N.J. Super. 377, 383 (App. Div. 1956). Here an essential for such a mutual understanding was absent in that the decedent, on behalf of whom these advances were being made, was totally ignorant of the fact. Whatever plaintiffs' subjective intent to be repaid, it could not supply the missing knowledge on the part of the beneficiary of the advances, required to sustain the inferential intent on his part to repay which would round out the postulated contract implied in fact.
It is elementary that one who pays the debt of another as a volunteer, having no obligation or liability to pay nor any interest menaced by the continued existence of the debt, cannot recover therefor from the beneficiary. Schmid v. First Camden National Bank, etc. Co., 130 N.J. Eq. 254, 266 (Ch. 1941). Nor can such a volunteer claim the benefit of the law of subrogation. Meier v. Planer, 107 N.J. Eq. 398 (Ch. 1930); cf. Leuppie v. Osborne, 52 N.J. Eq. 637 (Ch. 1894). If plaintiffs were mere volunteers, therefore, they would not, within these principles, be entitled to be subrogated to the creditor position of the hospitals and physicians whose bills they paid.
Notwithstanding the foregoing principles, however, we perceive in the evidence adduced at the trial, particularly in the version of the facts reflected in the deposition of Michael, adduced by defendant, a quasi-contractual basis of recovery which in our judgment ought to be submitted to a jury at a retrial of the case in the interests of substantial justice.
It is said that a "quasi-contractual obligation is one that is created by the law for reasons of justice, without any expression of assent * * *." 1 Corbin on Contracts (1950), § 19, p. 38; 1 Williston, Contracts (1957), § 3A, p. 13. This concept rests "on the equitable principle that a *88 person shall not be allowed to enrich himself unjustly at the expense of another, and on the principle that whatsoever it is certain that a man ought to do, that the law supposes him to have promised to do." St. Paul Fire, etc. Co. v. Indemnity Ins. Co. of No. America, 32 N.J. 17, 22 (1960). The Restatement of Restitution (1937) undertakes to formulate a number of rules growing out of recognized principles of quasi-contract. Id., at p. 5 et seq. Section 26 (p. 116), entitled "Mistake in Making Gifts," reads:
"(1) A person is entitled to restitution from another to whom gratuitously and induced thereto by a mistake of fact he has given money if the mistake (a) was caused by fraud or material misrepresentation, * * *."
An innocent misrepresentation by the donee is within the rule. Id., comment, at p. 117. A "mistaken belief in the existence of facts which would create a moral obligation upon the donor to make a gift would ordinarily be a basic error" justifying restitution. Id., at p. 118.
In the case of In re Marine Trust Co., 156 Misc. 297, 281 N.Y. Supp. 553 (Sup. Ct. 1935), the Roman Catholic Archdiocese of Philadelphia was held entitled to restitution from the estate of a deceased priest of sums of money it had advanced for his support during his lifetime when incompetent and apparently impoverished. A surviving brother had during the same period defrayed the remaining expenses of maintaining the decedent out of the latter's own substantial funds of which the brother had been acting as trustee. The Archdiocese did not know of the trust fund until after the incompetent's death. Recovery was expressly allowed on the theory of unjust enrichment of the decedent's estate at the expense of the Archdiocese. See also In re Agnew's Will, 132 Misc. 466, 230 N.Y.S. 519 (Surr. Ct. 1928); In re Thomas' Estate, 132 Misc. 842, 231 N.Y.S. 93 (Surr. Ct. 1928), both cases commented upon in 29 Colum. L. Rev. 95 (1929).
We think the foregoing authorities would apply in favor of sons, who, during their father's mortal illness, believing *89 him without means of meeting medical and hospital bills as a result of what he had previously told them, and wishing to spare him the discomfort of concern over such expenses at such a time, themselves assumed and paid the obligations. The leaving by the father of an estate far more than sufficient to have met the expenditures would, in such circumstances, and absent others affecting the basic equitable situation presented, properly invoke the concept of a quasi-contractual obligation of reimbursement of the sons by the estate. See also Great American Ins. Co. v. Yellen, 58 N.J. Super. 240, 244 (App. Div. 1959). Cf. Schaedel v. Reibolt, 33 N.J. Eq. 534 (Prerog. 1881). Such circumstances would take the payors out of the category of voluntary intermeddlers as to whom the policy of the law is to deny restitution or reimbursement.
We realize that although plaintiffs urge the theory of quasi-contractual obligation in their appellate brief, they did not do so in the pretrial order, and also that the claim of fraud was withdrawn at trial. As to the latter consideration, plaintiffs apparently intended only to withdraw the charge of fraud, as such, and not the reliance upon misrepresentation or mistake as to the decedent's financial means, as those facts were mentioned in their opening to the jury on two occasions. Furthermore, defendant appears to have understood that plaintiffs' position was in part based upon considerations of equity and justice, as he argued to the court in support of a motion to dismiss on the opening:
"I think that Mr. Lombardino [plaintiffs' attorney] construes his case to be a moral one, and perhaps morally there is some justification for claim, but legally there is absolutely nothing here * * *. I say that the Deskovick brothers acted on their own risk and acted as good Samaritans. In terms of the law, they did act at their own risk."
In view of the recognition by the parties at the trial of the existence of a possible issue of moral obligation inherent in the case, and the close relationship of that concept to the *90 theory of quasi-contractual liability outlined above as possibly applicable here, we regard the interests of justice as appropriately served by a retrial of the entire case on any issues the parties choose to specify in amended pleadings and in a new pretrial order, including obligation in quasi-contract, although ordinarily the issues fixed in the original pretrial order will control the litigation thereafter.
Reversed and remanded for a new trial.