831 A.2d 128 (2003)
363 N.J. Super. 111
Joann M. CARNEY, Plaintiff,
v.
Christopher J. HANSELL, Defendant.
Superior Court of New Jersey, Chancery Division.
February 28, 2003.
*130 Gregory J. Spadea, for Plaintiff.
Roger P. Main, Burlington, for Defendant.
*129 MILLARD, J.S.C.
In this case the court is called upon to determine plaintiff's claims for relief arising out of the parties cohabitation without marriage, for a period of 16½ years. At issue are claims for palimony in the form of future support, requests for distribution of assets acquired during the cohabitation, claims for equitable relief and counsel fees. This court is confronted with a situation similar to that faced by the trial judge in Kozlowski v. Kozlowski, 164 N.J.Super. 162, 395 A.2d 913 (Ch.Div.1978), aff'd 80 N.J. 378, 403 A.2d 902 (1979). Judge Polow put the issue this way:
The dilemma may be simply stated: Is there any remedy available under our law for a woman who has devoted 15 or more years living with a man, for whom she provided the necessary household services and emotional support to permit him to successfully pursue his business career and for whom she has performed housekeeping, cleaning and shopping services, run the household, raised the children, her own as well as his, all without benefit of a marriage; a woman who was literally forced out of the household with no ongoing support or wherewithal for her survival? [Kozlowski, 164 N.J.Super. at 170, 395 A.2d at 916-17, Crowe v. DeGoia[De Gioia], 203 N.J.Super. 22, 29, 495 A.2d 889, 893-94 (1985)]
The trial court opinion in Kozlowski analyzed the plaintiff's claim under theories of partnership law, joint venture, equitable theories of quasi-contract and quantum meruit, and finally under contract law. This court will follow the roadmap laid out by Judge Polow in Kozlowski, and affirmed by the Supreme Court.
Plaintiff is 43 years of age and was 26 when the parties met in the fall of 1984, and began dating. At the time, plaintiff was living with her sister in an apartment. She was not employed and was living off the remains of a personal injury settlement received approximately 2 years earlier. In or about December 1984, plaintiff became pregnant. Defendant offered for her to move into his apartment in Florence, which she did in January 1985. The party's son Joseph was born August 27, 1985. The parties exercise joint custody of Joseph, whose primary residence is with defendant. Plaintiff collects SSI Disability benefits in an approximate amount of $500/month, related to a medical condition known as Berger's Disease, and suffers the use of a prosthetic leg. Since 1985 she has had two (2) additional surgeries.
Defendant is 44 years of age. He has a history of completing some college, previously worked as a heavy equipment operator, and had purchased his first flatbed tow truck at about the time the parties met in 1984. Initially he utilized the truck for vehicle transport to junkyards and home delivery of orders from lumberyards. *131 He as well had suffered a back injury prior to the parties meeting and was using the trucking income to supplement his disability income. He testified his business operations at H & S Towing were kept "off the books" until the mid 1990's, as he had a pending disability case which had not been resolved. He received approximately $100,000 in 1995 on account of the disability case.
Plaintiff alleges that in 1989 defendant gave her a ring, which she believed was an engagement ring. Defendant steadfastly denies it. There was never any mention of it again by defendant and no party to celebrate. He says he gave her jewelry from time to time but he never gave her any engagement ring and never discussed marriage other than to say it would never happen. No witness testified to ever hearing defendant say anything about being engaged, and the court must conclude that they were not engaged, at least not in any traditional sense.
In the late 1990's a pair of credit cards came through in defendant's name and one in the name of "Mrs. Hansell." He claims not to have known about it, was furious upon discovering she was using the card and immediately canceled her card. Other than one occasion at school, Plaintiff did not identify herself or hold herself out as "Mrs. Hansell," and would generally correct third party's misconceptions.
Towards the end of 1985 the parties began the process of moving into a home at 860 Columbus Road, Burlington, New Jersey. This was an older home that needed to be substantially gutted and rehabbed to be habitable. The property was purchased by and titled to defendant's parents, and later his name was added to the deed.. The rehabilitation took a little over a month, and appears to have been accomplished by the active contributions of both parties and family members on both sides as well as many friends. Funds for the rehabilitation were provided by defendant. When they moved into Columbus Road, plaintiff supplied much of the furniture, which had been in storage after her move into defendant's apartment. They lived at Columbus Road from 1985 until the summer of 1997, when they moved to the "warehouse" on Belgrade. Several times plaintiff asked Defendant if he would include her name on the deed. He told her it was never going to happen because it was his house.
Life at 860 Columbus Road appears to have been a relatively content time for the parties. Plaintiff maintained the house, did the laundry, food shopping, cooking and was responsible for the primary care of their son. Defendant likewise contributed in all these areas, helping out when he was not involved in his business pursuits. There were many large parties that Plaintiff would help host and organize for their friends and business associates. While defendant paid for most expenses connected with the home, plaintiff spent her disability check each month for groceries, toiletries and clothes for their son. It was also during this time that the parties began to build the towing business.
The towing business began around the time the parties met. Over the ensuing years defendant upgraded the make of the flatbed and eventually added a commercial tow truck by 1990. The business was built from the ground up and both parties contributed substantially to its success. In the beginning they would drive around the area to place flyers and stickers in pay phones. Incoming calls for towing would come into the Columbus Road phone and routinely be answered by plaintiff, who in turn would call and advise Defendant out on the road of the job.
Plaintiff handled much of the paperwork for the business. She collected and sorted *132 expenses, gas and toll receipts, and assimilated the documents on a monthly or quarterly basis. She handled much of the dispatch of calls, as they would often originate through the household phone. These calls occurred at all hours of the night and day, and she sometimes would handle pricing of tows with customers, before transferring the call to defendant. Fridays she would travel to the various auto body and commercial customers to pick up checks owed to the business. She had authority to sign checks on defendant's behalf, and wrote and paid many of the business bills. Many times she would accompany defendant in the tow truck and write the invoice or generally assist, and on a couple of occasions when he was not available, even operated the truck herself. She went to court to prosecute bad checks, she picked up parts from auto parts dealers, and she prepared monthly invoices. Plaintiff was deeply involved in the business and knew it inside and out. She says she always felt that they were partners in building this business. Over the years the business prospered, increasingly adding new accounts, auto body shops, police towing, travel companies and miscellaneous other commercial accounts.
What is equally clear is that defendant went to great lengths to be certain that plaintiff was not his legal business partner. All trucks and business accounts were solely in his name. On several occasions she asked him to include her as a named party in the business and he always refused. She says he point blank told her that nothing would ever be in her name. On one occasion defendant told plaintiff that he would burn the business down before she would ever get anything. It was clear he considered it as his sweat and equity alone, which was responsible for the success of the business.
The parties moved into the Belgrade property the end of 1997. This was a 12,000 square feet warehouse with an attached 2,200 square feet residential unit. The warehouse space was for the business and defendant used an attached impound yard to park customer cars and many of his personal vehicles. The parties resided in the residential unit. This property was titled to defendant.
Financially, defendant kept plaintiff on a "short leash." If they needed a particular item to be purchased, she would have to ask him for the cash, and account for each dollar she spent. She says financially it was always a fight, and she had to literally beg him for money. Plaintiff felt she was or should be considered defendant's partner but he did not treat her that way. The arguments grew more frequent, until by 1993, she demanded that she receive something tangible for her work in building and helping run the business. He acceded to begin paying her $60/week for her services to the business. She received nothing prior to this point in time. At her insistence, by 1995, the weekly stipend was increased to $100.
As time went on, plaintiff testified that the relationship got "very terrible." They were fighting all the time. She wanted to make a new life for herself but she could not leave because she had absolutely nothing and he made clear that he would give her absolutely nothing. There were literally no assets in her name. She needed some small amount of seed money to get started on her own. She begged him to help her out, but he refused. His pet sayings to her, repeated frequently during the relationship, were, "Leave Joann. If you think you have it so bad, get out, leave," and "Don't let the door hit you in the ass."
At the time of the separation, defendant's assets were: the H & S Towing *133 business, including the flatbed and tow truck; a vacant lot on Rte. 130; 510 Logan Avenue, which is an industrial building he purchased in 1998; 1337 Belgrade, a residence next door to the warehouse, which he purchased in 2000; 1311 Belgrade, purchased in 1998, and which Defendant values at $100,000 and Plaintiff at $250,000; 860 Columbus Road, jointly with his parents; numerous "collectable" vehicles; $27,000 in an investment account; and $6,000 in a business account. No valuations have been provided to the court as to the value of the business or of any real estate. At the time of separation plaintiff had no assets except her personal effects and her monthly SSI disability check.
The deteriorating relationship of the parties continued over the summer of 2001. There were frequent arguments, though in other respects life continued as over the past years. Plaintiff states she felt defendant had changed, he was only concerned with possessions, that there was no longer any emotional connection, although they still had sexual relations. She had asked him to sleep on the couch and he refused. Towards the end of August 2001, a female employee of the towing business began spending more and more time at their residence. It became apparent to her that this employee and defendant were having a relationship. As a result of this and other indignities she went through with defendant, she felt completely degraded. Plaintiff says by this point she no longer felt like a person. She needed to pick up the pieces of her life. On Halloween night they held a party and they began arguing. Defendant again told plaintiff to leave if she did not like it. She asked him for financial assistance in the form of a car and some money to help her get set up in another house. Defendant refused, as well as telling plaintiff she could not take "her car." He told her she could ride the public bus. To be certain that she did not take it, he took the wheels off the vehicle. She left with nothing but her personal effects. Plaintiff currently resides with her mother.
Plaintiff alleges that during the early years of the relationship defendant made promises to her or inferences that she interpreted as promises to support her or take care of her. She claims that he said that he would always take care of her, and that this or that purchase would be for their life together or their retirement. Plaintiff says she loved defendant all through the relationship and always believed they would spend the rest of their lives together.
Defendant defiantly testifies that he never loved her and only claims to have allowed her to move in as some sort of accommodation to her. He testified that they never discussed a future together or his providing for her. If anything, he always told her if she was not happy, then get out. Defendant said the only arrangement was that he paid all the bills and expenses while they lived together. If she did not like what was happening she could leave. He claims there was never any discussion of marriage. His claim, that throughout the relationship he repeatedly told her that she could leave if she did not like it, was a refrain familiar to almost all witnesses in the trial. Defendant also went to extraordinary lengths not to put any assets in plaintiff's name, and repeatedly told her she would never share in them.
Whether by inference, direct agreement or implied agreement by conduct, this court is satisfied that the only agreement or understanding that the parties had in common, was that defendant would provide for plaintiff for as long as she resided with him. At every turn he advised her in blunt and often offensive language, that she would have no share of his assets and *134 should never expect anything from him, except under his terms. In other words, so long as she lived with him he would share his lifestyle with her under his terms, but should she leave, she would have nothing. Certainly plaintiff was not happy with this arrangement and often times requested future assurances, "something in her name," but there is no indication to the court that there was ever any agreement by Defendant as to future support or sharing of assets in the future.
Plaintiff and defendant enjoyed a middle class lifestyle during the 16½ years spent together. She testified that it would require approximately $1,500 a month in expenses to support her self in a simplistic lifestyle similar to that which she had with the defendant. Proofs were significantly lacking concerning the nature of her expenses. The proffered figure appears to be optimistic and likely insufficient to meet her actual expenses were she in her own apartment. Plaintiff receives approximately $500/month in SSI disability benefits. She testified that she has worked in the past and could work at least part time, at a rate of approximately $10 per hour. Her disability may impact on the number of hours she would be capable of working.
Plaintiff claims that she was a partner in H & S Towing, and as such is entitled to a percentage of the value of the business. This position is vigorously opposed by defendant. There is no question that she was instrumental in assisting defendant in building his business and in helping it grow. Her contribution, outlined above, was real and significant. However plaintiff's claim that she believed she was a partner must be weighed against the legal realities present here. All assets were titled exclusively in defendant's name. He repeatedly told her she would never own any portion of the business. There was no partnership agreement. All capital at risk in the business belonged to defendant. Though plaintiff was authorized to write defendant's signature on checks, she did not have signatory power in her own name. Any partnership profits or losses were distributed directly to defendant. The Uniform Partnership Law, NJSA 42:1-7 establishes rules for determining the existence of a partnership. Elements of a partnership include agreement, sharing profits and losses and ownership and control of the business property among other issues. See Kozlowski, 164 N.J.Super. at 171, 395 A.2d at 917 (citing Fenwick v. U.C.C. of N.J., 133 N.J.L. 295, 44 A.2d 172 (E & A 1945)).
The elements required to establish a joint venture are essentially the same as that for a partnership. See Kozlowski, 164 N.J.Super. at 171, 395 A.2d at 917 (citing Wittner v. Metzger, 72 N.J.Super. 438, 178 A.2d 671 (App.Div.1962), cert. denied, 37 N.J. 228, 181 A.2d 12 (1962)).
In the present case, the plaintiff and defendant never held themselves out to be husband and wife, never filed joint tax returns, never co-mingled funds or shared a joint checking account, never shared title to any assets and defendant repeatedly told plaintiff she would never share in them.[1]
*135 The facts of this case do no not support the existence of a partnership or joint venture between the parties. Ownership of the business was vested exclusively in defendant. Plaintiff is not entitled to share in the assets or value of the business by virtue of any claim that she was a legal partner with defendant.
This court finds that plaintiff did not gratuitously donate her work, time, effort, enthusiasm and zeal for this business enterprise for some 15 years for nothing. She felt the business and her relationship with defendant represented her future financial security. She clearly expected to be compensated for her efforts. Many of the arguments between the parties centered on the fact that plaintiff felt she was not being adequately and properly compensated for her work for the business. If plaintiff was not a partner, and not gratuitously donating her work effort, then she held the status of an employee to the business. Her relationship to defendant was of course much more than this.
There is a separation between plaintiff's role as homemaker, mother and housemate, and her role as a key employee of the business. As to the former role as homemaker, claims for compensation for services rendered must fail, as she received the benefit of the bargain of her relationship with defendant. He provided for her support and those expenses which he approved, for as long as she resided with him. However, her claims for past due compensation for services rendered to defendant on account of the business, are an entirely different matter. Plaintiff's claim that defendant's business interest has been unjustly enriched at her expense and great loss has been proven by clear and convincing evidence.
Defendant took advantage of plaintiff due to her relationship to him and her total reliance upon him for support and shelter. She was a key employee of the business. For eight years she received no compensation at all for her services. She had little or no bargaining power. Then in 1993 she finally prevailed upon defendant who began to pay her $60 per week. She complained bitterly to defendant that the $60 was not fair, and in 1995 the payment was increased to $100. Throughout the later part of the 1990's she continued to complain that she was not being properly compensated. During this later period she wrote herself additional checks, which defendant testified totaled around $1,000. Plaintiff claims to have asked him for these additional checks, but he adamantly asserts they were unauthorized. As a result of defendant's discovery of these checks in September 2000, her services for the business ended, as did the $100 checks.
To recover under a theory of quantum meruit, a plaintiff must establish (1) performance of services in good faith, (2) acceptance of the services by the person to whom rendered, (3) an expectation of compensation by the person performing the services, and (4) the reasonable value of the services. The recovery rests upon *136 the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another. Starkey v. Estate of Nicolaysen, 172 N.J. 60, 796 A.2d 238 (2002), Weichert Co. Realtors v. Ryan, 128 N.J. 427, 437, 608 A.2d 280, 285 (1992). All elements of the test are met in the present case.
Plaintiff testified that she estimated she worked at the business for approximately 30 hours per week. The varied and diverse nature of the work performed is detailed above. Defendant minimizes her contribution and claims she worked no more than a couple hours per week. The court is satisfied that the nature of the services described is substantial and consistent with plaintiff's time estimate. Defendant, of course, would not know of the total amount of time that plaintiff worked as he was out on the road during much of the periods of time she was working. The nature of the services were such that it interrupted her day on a regular basis with calls coming at all hours of the day and night. To compensate an employee to cover the length and breadth of the time serviced by plaintiff would require compensating an employee, or perhaps 2, well in excess of the 30 hours to which Plaintiff has testified. The court finds that Plaintiff was working on average 30 hours per week for the business, essentially 52 weeks a year.
No specific testimony is offered as to the value of plaintiff's work effort, but she did testify that she worked briefly at Auerbach and Willingboro Chrysler during the later 1990's, earning between $6.75 and $8.00 per hour for similar type work. This court is satisfied however, that it is entirely appropriate to apply prevailing minimum wage standards to the hours worked. As a key employee to the business, there is no doubt her services were worth more than minimum wage, but applying another standard would be speculation not supported by the record.
The court will take judicial notice of the Federal Labor Standards Act and NJSA 34:11-56a4. See N.J. R. Evid. 201. New Jersey followed the federal minimum wage rates during the relevant times with the exception of the period from 1991 to Sept. 1, 1997, when New Jersey adopted a higher minimum wage of $5.05. The wages for the relevant time periods are 1985 to April 1, 1990 at $3.35, April 1, 1990 to April 1, 1992 at $4.25, April 1, 1992 to Sept. 1, 1997 at $5.05, and Sept. 1, 1997 to 2000 at $5.15.
Plaintiff is entitled to a quantum meruit recovery for the years 1986 through September 2000. Defendant is entitled to a credit for payments of $60 per week for the two years of 1993 and 1994, and $100 per week for 1995 through September 1, 2000. Defendant will also receive credit for the $1,000 in checks plaintiff received, which he claims were unauthorized. While no specific testimony was produced to indicate that plaintiff worked anything less than 52 weeks per year, the court will compute damages based upon plaintiff working 50 weeks per year. The court's attached Schedule A, applies the above formula to determine the measure of damages. Damages on plaintiff's claim for quantum meruit recovery is set at $62,986.
Plaintiff seeks to have the court distribute to her one or more of the various parcels of real estate purchased by defendant during the period of cohabitation. The plaintiff is not a titled owner to any of the real estate or listed on any of the mortgages and she did not contribute capital to the purchase of the parcels.[2] She has no contractual claim to the properties. She is not entitled to equitable distribution, *137 as she and defendant are not married. See Kozlowski, 164 N.J.Super. at 170, 395 A.2d at 916-17. Her claim for distribution of the real estate is denied.
Plaintiff's claim concerning the Sebring automobile, or rather the value of the car, is somewhat different. When the parties cohabited back in 1985, plaintiff owned her own "new" vehicle. Defendant convinced plaintiff that the vehicle should be transferred into his name, "for insurance purposes." It was later involved in an accident, and the insurance proceeds were applied towards the purchase price of a new vehicle. Over the years her car was always traded in on a more up to date vehicle. The vehicles were always titled in defendant's name. At the time of separation in 2001 "her car," was a Sebring, valued at $12,000. The vehicle was always referred to as her car and she took care of it. As referenced above, when plaintiff left defendant in 2001, he took the wheels off the car to prevent her from taking the vehicle with her.
The court is satisfied that, notwithstanding title being in defendant's name, the original intention of the parties was that her original vehicle and any successor vehicle would be the property of plaintiff. Whether by contractual agreement, or on principles of quasi-contract, plaintiff is entitled to damages in the sum of $12,000 on account of defendant's refusal to turn over the vehicle to her at the time of separation. See Deskovick v. Porzio, 78 N.J.Super. 82, 187 A.2d 610 (1963).
In Kozlowski and recently confirmed again in, In the Matter of the Estate of Roccamonte, 174 N.J. 381, 808 A.2d 838 (2002), the Supreme Court has established a palimony cause of action for future support, based upon contractual agreement, express or implied. As noted above, the only contractual agreement between these parties was for defendant to support plaintiff for as long as she lived with him. This is likely more typical of the type of implied agreement between non-married parties more prevalent in today's world, than an agreement to provide support for life. On a purely contractual basis, this court cannot award damages to plaintiff for future support when there was never an agreement to provide for the same. Plaintiff's claim for future support predicated upon contract, express or implied, must be denied.
Plaintiff also seeks future support, predicated upon the equitable doctrines of quasi contract or quantum meruit. There is little difficulty in reaching the conclusion in this case that defendant has dealt inequitably with the plaintiff. After 16½ years together, plaintiff leaves the relationship destitute and impoverished. She helped defendant build his business, but reaps no benefit of its success. She maintained the household for all these years yet has no share of the value of this or any of the other properties acquired by Defendant. She receives no future support from defendant and is left to live on her SSI disability payments and such part time employment she can work at with her disability. It is true however that none of these conditions came as a surprise to plaintiff. Defendant repeatedly made clear his intentions.
In Kozlowski, the seminal case in New Jersey on the palimony cause of action, the court provided relief for just such a woman, based upon an oral contract to provide future support. The majority decision made clear that such an agreement may be express or implied. However, the applicability of equitable as opposed to contractual relief was not reached by the Court, as there was a specific finding that a contract for future support existed. This issue, not specifically addressed by the majority decision *138 in Kozlowski, is raised by Justice Pashman in his concurring opinion:
The question which remains is whether quasi-contractual and equitable remedies should also be available to the parties upon dissolution of their relationship... an agreement such as is here present [contract for future support for life] may not exist in the vast majority of cases. [80 N.J. at 390, 403 A.2d at 909]
Justice Pashman concluded that equitable remedies should be available, "to insure that one party has not been unjustly enriched, and the other unjustly impoverished, on account of their dealings." Id. at 391, 403 A.2d at 909.
Being unmarried, plaintiff of course has no right to alimony or equitable distribution. Id. at 383, 403 A.2d at 905. Justice Pashman's concurring decision aside, no New Jersey decision to date has extended the right to receive palimony for future support without finding the existence of such a contractual agreement between the parties. There is a compelling temptation to cross that bridge to provide such support in this case under the various equitable theories addressed by Justice Pashman. However, this court feels constrained to deny the relief requested.
There are significant issues effecting social policy considerations present in any determination to expand post separation support among non-married parties beyond the contractual agreements of the parties themselves. How can such relief be granted when alimony is expressly prohibited for non-married parties? Without a contract to enforce, what would be the measure of damages? Should unmarried parties be allowed to cohabit without a future support obligation being imposed, regardless of the economic circumstances of the individuals?
If such a significant departure from the current state of the law is to be granted, it needs to be authorized by either the legislature or a higher court of this state. Plaintiff's request for future support is denied. Appellate review of this decision is of course available to the respective parties.
Plaintiff is not entitled to counsel fees in a palimony action. See Crowe v. De Gioia, 203 N.J.Super. 22, 39, 495 A.2d 889, 899 (1985).
An Order consistent with this opinion will be entered for Judgment in favor of plaintiff and against defendant in an amount of $74,986. Judgment shall be payable as the court on motion shall determine.

*139 SCHEDULE A

YEAR WAGE HOURS WEEKS TOTAL WAGES AMOUNT
 EARNED PAID DUE
1986 $3.35 30 50 $5,025 0 $5,025
1987 $3.35 30 50 $5,025 0 $5,025
1988 $3.35 30 50 $5,025 0 $5,025
1989 $3.35 30 50 $5,025 0 $5,025
1990:
1/1-4/1 $3.35 30 13 $1,306 0 $1,306
4/1-12/31 $4.25 30 37 $4,717 0 $4,717
1991 $4.25 30 50 $6,375 0 $6,375
1992:
1/1-4/1 $4.25 30 13 $1,657 0 $1,657
4/1/12/31 $5.05 30 37 $5,605 0 $5,605
1993 $5.05 30 50 $7,575 $3,000 $4,575
1994 $5.05 30 50 $7,575 $3,000 $4,575
1995 $5.05 30 50 $7,575 $5,000 $2,575
1996 $5.05 30 50 $7,575 $5,000 $2,575
1997:
1/1-9-1 $5.05 30 34 $5,151 $3,400 $1,751
9/1-12/31 $5.15 30 16 $2,472 $1,600 $872
1998 $5.15 30 50 $7,725 $5,000 $2,725
1999 $5.15 30 50 $7,725 $5,000 $2,725
2000:
1/1-9/1 $5.15 30 34 $5,253 $3,400 $1,853
 TOTAL $63,986
 Checks $1,000
 received by
 Plaintiff
 TOTALDUE $62,986

NOTES
[1] In Recigno v. Recigno, a recent decision by the Superior Court of New Jersey, Appellate Division, the Appellate Court affirmed a judgment awarding plaintiff $133,625 for her share of the assets the parties acquired during their long-term relationship. See Recigno v. Recigno, N.J. Sup.App. Div. (slip op.) (Jan, 7, 2003). While there are some similarities between the circumstances in the Recigno case and the case at hand, most of the pertinent facts of this case are clearly inapplicable. In Recigno, the parties held themselves out as husband and wife, the plaintiff's sister testified she understood the parties to be married and observed an engagement ring and wedding band on plaintiff's hand, and defendant's parents addressed correspondence to the parties as "Mr. and Mrs. P. Recigno." During their twenty-six (26) year relationship, the parties shared a personal and business partnership, acquired joint real estate, co-mingled their funds, deposited their respective paychecks into a joint bank account, filed a tax return as "Married, Filing Joint Return," defendant named plaintiff his wife on his work-related health insurance policy throughout the relationship, and the parties acquired a mortgage in the name of "Peter P. Recigno and Lois L. Recigno, his wife." The trial judge found that "the nature of the relationship between the parties was truly a joint venture of a personal and business nature and that it was the mutual intent of the parties to be partners . . ." Recigno, A-2023-01T5 slip op. at 5.
[2] Contrast Recigno v. Recigno, A-2023-01T5, slip op. (N.J.Super.Ct.App.Div. Jan, 7, 2003).