946 A.2d 1051 (2008)
400 N.J. Super. 220
The ESTATE OF Kathryn E. SPENCER; The Estate of Anna E. Spencer; and The Estate of Madeline S. King, Plaintiffs-Appellants/Cross-Respondents
v.
Daniel J. GAVIN, Esq.; and The Estate of Daniel J. Gavin, Defendants/Cross-Respondents, and
Roberta Gavin, a/k/a Roberta Desanctis a/k/a Roberta Bergstein, individually and as executrix of the Estate of Daniel J. Gavin; Edna Bergstein; Irving Bergstein; Alberta Foster, Esq.; Sandra Gonzalez; Mercy Rodriguez a/k/a Mercy Delgado; Steven Moriarty; Suzy Anderson, ISA, individually and t/a Heritage Antiques and Appraisal Services; and Western Surety Company, its successors or assigns as their interests may appear, Defendants, and
Dean Averna, Esq.; and Averna & Gardner, Esqs., Defendants-Respondents/Cross-Appellants, and
First State Bank, n/k/a Sovereign Bank, a banking institution of the State of New Jersey, its successors or assigns as their interests may appear, Defendant-Respondent.
No. A-0424-06T5
Superior Court of New Jersey, Appellate Division.
Argued December 17, 2007.
Decided April 23, 2008.
*1054 Steven J. Fram, Haddonfield, argued the cause for appellants/cross-respondents (Archer & Greiner, and Erik Shanni,[1] attorneys; Mr. Fram, on the brief).
Sean E. Regan, Red Bank, argued the cause for respondents/cross-appellants (Giordano, Halleran & Ciesla, attorneys; Louis D. Tambaro, on the brief; Mr. Regan, of counsel and on the brief).
Christopher Carey, Morristown, argued the cause for cross-respondents Daniel J. Gavin, Esq. and The Estate of Daniel J. Gavin (Graham Curtin, P.A., attorneys; Mr. Carey, of counsel; David M. Blackwell and William D. Tully, Jr., on the brief).
Thomas J. Hall, argued the cause for respondent First State Bank (The Law Firm of Hall and Hall, attorneys; Mr. Hall, on the brief).
Before Judges LINTNER, SABATINO and ALVAREZ.
The opinion of the court was delivered by SABATINO, J.A.D.
The professional liability issues in this case arise out of circumstances in which a lawyer, while acting in his capacity as an executor and administrator, stole $400,000 or more from his clients' three related estates. Within months after absconding with those funds and dissipating them, the lawyer-executor died of cancer.
The primary question before us is whether a fellow attorney who evidently did not participate in the thievery, but who had a close and interdependent business relationship with the lawyer-executor, and who concurrently performed legal work at the lawyer-executor's request for at least one of the same estates, had a duty to report the lawyer-executor's malfeasance upon allegedly learning of it. We hold that a reporting duty in such circumstances is mandated by principles of legal *1055 ethics, tort law, and public policy, so long as the attorney is shown to have had actual knowledge of the other lawyer's wrongdoing.
Because the trial court failed to recognize this duty as a matter of law, and because there are genuine issues of material fact as to whether the defendant attorney was actually aware of any of the lawyer-executor's multiple thefts, we vacate summary judgment the court entered in the attorney's favor. We thus remand for a trial to adjudicate the attorney's potential liability to the financially-depleted estates. If the attorney's actual knowledge of wrongdoing is proven, the jury also will need to determine whether his inaction proximately caused any injury to the estates.
We sustain, however, the trial court's separate ruling that no de facto partnership existed between the defendant attorney and the lawyer-executor. We also affirm the court's entry of summary judgment in favor of the bank that paid checks drawn on the estate accounts to the lawyer-executor and his fiancé.

I.
This case involves a sad chronology of opportunism, deception and the plundering of client assets by a terminally-ill lawyer. The pertinent facts are substantially undisputed, except for the pivotal question of the actual knowledge of the lawyer's thefts by another attorney, who allegedly could have done something to prevent further harm to the estates, but who failed to do so.
The three plaintiffs are the respective estates of Anne E. Spencer and of her two daughters, Madeline (Spencer) King and Kathryn E. Spencer. Anne Spencer died in 1960, leaving Kathryn as the executrix of her estate. Madeline died in 1985. She likewise appointed her sister Kathryn as her executrix.
Madeline had retained defendant Daniel J. Gavin, a lawyer with a solo practice, to prepare her Last Will and Testament. Through her will, Madeline requested that Gavin be retained for any additional legal services needed in connection with her estate.
Kathryn Spencer resided on Main Street in Woodbridge. Beginning in 1985, Gavin operated his law practice out of an office building located on Main Street across from Kathryn's house. As her sister had requested, Kathryn retained Gavin to represent Madeline's estate and to assist in its administration. Similarly, Kathryn, in her own Last Will and Testament, named Gavin as her executor. Kathryn also lent Gavin $50,000 in 1986 so that he could purchase the building on Main Street that housed his law office.
During this time, Gavin was in a long-standing personal relationship with Roberta Bergstein, now known as Roberta Gavin.[2] Bergstein worked for Gavin in various capacities as a legal secretary, paralegal, and notary public. Gavin eventually married Bergstein in 1994.
In addition to operating his own law practice there, Gavin leased space in his Main Street office to several other attorneys. Among those tenants in the early to middle 1990s were defendant Dean Averna, Esq., and Michael Gardner, Esq., who practiced together as Averna & Gardner, P.C.[3] Gavin also rented space in his building *1056 to defendant Alberta Foster, an attorney, as well as to attorneys Maria Plinio, Natalee Picillo, and Toni Ann Marcolini.
Averna's Relationship With Gavin
Averna became a licensed attorney in New Jersey in 1990. He rented space in Gavin's building from March 1992 until April 1995. Around this same time, Gavin was beginning to decrease his caseload, often arranging for other attorneys in his building to work on files on a per diem basis. According to Bergstein's deposition testimony, Gavin had told her that he hoped to take on a partner and go into semi-retirement. Gavin's long-term goal was to transfer all of his client files and just manage the building.
The record shows that, during the relevant time frame, Gavin most often turned to Averna for assistance. This help included Averna performing discrete tasks on Gavin's files, as well as Gavin referring entire matters to him. Averna testified at his deposition that during his three years working out of the Main Street office, Gavin referred him about ten to fifteen cases. Averna usually paid Gavin one-third of any fee that he earned on those cases.[4] Most of those referred matters were personal injury cases.
Other attorneys in the building perceived a close working relationship between Averna and Gavin. In her deposition, Plinio recalled that Gavin spent "substantially more" time with Averna than with anyone else in the building. Plinio testified "[i]t was open knowledge . . . of all of the attorneys [in the building] . . . that most of the work was given [by Gavin] to [Averna] and that [Gavin] was in [Averna's] office most of the time and working on most of the files with [Averna] on a regular basis." Plinio recalled Averna often going to court on behalf of clients who had originally been represented by Gavin.
According to Plinio, Averna regularly used legal forms that had Gavin's name on them. This likely was a result of Averna taking on Gavin's former legal assistant and receptionist, defendant Mercy Delgado (a/k/a Mercy Moriarity), to work in his practice. Delgado confirmed in her own deposition that, about one month after Averna became a tenant in Gavin's building, he moved into Gavin's old office. At the same time, Gavin informed Delgado that she would now be working for Averna.
It was common knowledge in the building, according to Plinio, that Averna was "slowly taking over [Gavin's] practice." She recalled that:
[Averna] was taking over [Gavin's] caseload. He was taking over his secretary. He was then going to take over the office. He was going to then buy the building, but they could not agree on a price. He was going to . . . take over everything, as far as I was aware.
This perception was corroborated by Marcolini, who testified in depositions that Gavin had told her that he was "grooming [Averna] to take over his practice."
Averna denies that he had any professional relationship or anticipated partnership with Gavin. During the course of *1057 discovery, Averna submitted a certification in 2003 stating that, "[a]lthough Gavin would occasionally refer cases to me, I was at no time his partner or in any way associated with his firm." In a subsequent certification in 2005, Averna reiterated that "I have never been formally or informally associated with Daniel Gavin in the practice of law."
Aside from the observations of Plinio and Marcolini, other evidence tends to contradict Averna's denial of any association with Gavin. For instance, Bergstein testified at her deposition that Gavin had told her that he had discussed a partnership with Averna, although their plans were never implemented.
The discovery process further uncovered a noteworthy letter that had been sent in September 1994 to the Tribus Companies, Averna's professional liability insurance carrier. The letter announced a forthcoming change in the name of Averna's law firm. That letter, dated September 28, 1994, stated:
Pursuant to your telephone conversation with my office, this letter shall serve as confirmation that as of October 1, 1994[,] Averna & Gardner, P.C. will change its name to Gavin, Averna & Gardner, P.C. With this change, the firm will also be employing Daniel J. Gavin, Esq., who is retired, in an "of counsel" role[,] and Frank Baffige, Esq. as an associate.
The letterhead on that correspondence bears the name "Gavin, Averna & Gardner, A Professional Law Corporation." The letter was purportedly signed by Averna.
Averna disclaims responsibility for the September 1994 letter to Tribus. Specifically, Averna certified that he "did not write, prepare, approve or sign" it.[5] In any event, the partnership was never formally constituted and the firm's name change was never effectuated.
Gavin's Thefts from the Estates
Kathryn Spencer passed away on May 27, 1994, at the age of eighty-eight, leaving behind a sizable estate. Gavin was appointed Kathryn's executor, pursuant to her will. As Kathryn had been the executrix of her mother's and sister's estates, both of which were still open[6] at the time of Kathryn's death, Gavin administered all three estates. Gavin's role as substitute administrator for Anne's estate was formalized in August 1994.[7]
About the same time as Kathryn died, Gavin began to develop serious health problems of his own. He was in pain and lost a significant amount of weight. As a result, he was not able to work full-time on his clients' files.
In August 1994, Gavin was diagnosed with terminal lung cancer. He underwent chemotherapy and radiation treatment for the next five months. After learning that he was seriously ill, Gavin and Bergstein, his longtime companion and assistant, married on September 17, 1994.
After Kathryn's death, rumors began to circulate throughout Gavin's building that he was acting improperly in his handling of the three Spencer estates. In particular, Marcolini testified that she had heard reports *1058 that Gavin was stealing funds and property from Kathryn's estate. Marcolini recalled in this regard a conversation she had with Gavin's nephew, who was a janitor in the building. The nephew told her that he had helped Gavin remove several suitcases from Kathryn's house and place them in Gavin's car trunk. According to Marcolini, the nephew stated that he suspected that those suitcases contained cash. Marcolini had also heard that other employees, including Gavin's former assistant Delgado, had received personal property from Gavin that had been removed from Kathryn's house. There also were rumors circulating in the building, which were never confirmed, that Averna possessed a gun that had been taken from Kathryn's estate.[8]
Averna's Nexus to the Spencer Estates
In June 1994 Gavin asked Averna to form the Spencer Foundation, a non-profit corporation intended to manage and disburse a portion of the assets of Kathryn's estate for charitable purposes. Averna worked on this assignment from June through September 1994, and successfully created the Foundation. He billed $2,500 for this work, submitting invoices to Gavin on July 31 and September 30, 1994.
As a second project, Gavin asked Averna in September 1994 to draft a contract between the Foundation and a builder named Anthony Laycock, for construction and repairs on the Woodbridge Methodist Church.[9] After preparing the contract as requested, Averna submitted a $350 invoice to Gavin on September 30, 1994. Other than these two discrete matters, Averna insists he had no connection to the plaintiffs' estates, and that he never worked on any other related files.
Averna emphatically denies that he knew at the time that Gavin was stealing funds or property from the plaintiffs' estates, or that Gavin had otherwise acted improperly. He asserts he first learned of Gavin's conduct when the present lawsuit was filed in July 2000. Averna also claims that he was unaware that Gavin had been representing the estates of Anne Spencer and Madeline King, in addition to Kathryn's estate.
Nonetheless, there is considerable proof in the record that, if believed by a factfinder, circumstantially indicates that Averna was not ignorant of Gavin's misdeeds. The principal source of this counterproof is the deposition testimony of Marcolini. In particular, Marcolini attested that Averna told her, at some point before Gavin's death, that Gavin was "raping and pillaging" Kathryn's estate. She elaborated:
He left the impression that he thought [Gavin] was stealing from the estate. . . . He didn't give us [Marcolini and Plinio] too many facts of what he was specifically talking about, nor did [Plinio] or I have any interest in being involved in whatever was happening.
Marcolini further recalled another conversation with Averna, in which he revealed to her that Gavin had stolen a pair of wedding rings from the estate. She claims that Averna went on to tell her that Gavin had used the stolen rings when he married Bergstein, and that Gavin even had been buried wearing one of them.
Marcolini believed that Averna knew of Gavin's wrongdoing, but that he chose to *1059 look the other way. She did not, however, think that Averna himself had participated in stealing from the estates.[10]
Gavin succumbed to his illness on February 1, 1995. Along with Bergstein, Foster took responsibility for winding up Gavin's affairs. Foster[11] took over Gavin's practice, including the files of the three estates. Shortly after Gavin's death, Averna and several of the other lawyer tenants left the Main Street premises.
Several months later, in October 1995, Erik Shanni was appointed as substitute administrator for Kathryn Spencer's estate. As Shanni began to search for and compile estate records, he learned from Foster that Averna had worked on Kathryn's estate with Gavin, and that Averna likely had relevant documents in his possession.
Shanni subsequently contacted Averna and requested that he provide copies of documents relating to the estates. He received back from Averna only paperwork concerning the services that Averna had performed in creating the Spencer Foundation and in drafting the construction contract for the church. Averna denies having any other information relating to the estates. Shanni contends, however, that Averna did share with him certain "anecdotes" about his work with the Spencer estates.
The Discovery of Gavin's Misappropriations and The Related Bank Transactions
After investigating more deeply, Shanni eventually concluded that Gavin had perpetuated a massive theft of assets from the three estates. It is undisputed that, in the months between Kathryn Spencer's death and his own death, Gavin stole between $400,000 and $500,000 from the estates. Gavin siphoned the majority of those funds through the use of fiduciary accounts.
Gavin accomplished these thefts through a series of bank transactions. On July 14, 1994, Gavin opened a non-interest bearing account in the name of Kathryn Spencer's estate at the First State Bank in Howell ("the Bank").[12] Over the next few days, Gavin deposited a total of $256,925 in the account, in the form of various financial instruments and checks belonging to or payable to Kathryn Spencer.
A few weeks later, Gavin wrote several checks on the accounts of Kathryn's estate, totaling $218,000. These checks included, among others, four checks made out to "Roberta Bergstein," each for the identical sum of $50,000, and written on August 10, 1994. All four checks had the designation "Beneficiary Distrib." written in the memo line. Gavin also wrote two $9,000 checks payable to himself that same week. Later, in October 1994, Gavin made a series of smaller withdrawals from the account, depleting the funds down to $400. He closed the account on December 20, 1994, by withdrawing the remaining balance of $393.
On October 7, 1994, Gavin opened a second account at the Bank in the name of the Anne Spencer estate, in which he deposited *1060 $125,476. Two weeks later, Gavin wrote a check drawn on that account for $120,000, payable to himself as executor. Gavin then used that money to purchase three treasury checks from the Bank for $40,000 each, made payable to Roberta Bergstein. Those treasury checks were co-signed by two Bank employees. Gavin closed Anne's estate account on December 20, 1994, when he wrote a check to himself for the remaining balance of $2,570.
Meanwhile, Gavin directed Bergstein to open checking accounts at five or six different banks in New York City. She did so in July 1994. Bergstein deposited into those accounts the various checks that Gavin had written to her from the estates' funds. Thereafter, about once a month up until the time of Gavin's death, Gavin and Bergstein would go to the New York banks, where Bergstein would customarily withdraw about $7,000 to $8,000 from each bank and hand the cash to Gavin. He would then put the money in his briefcase. According to Bergstein she never asked Gavin any questions about these transactions, and she claims that she did not know what he did with the cash they had obtained.
The Estates' Efforts to Recoup Their Losses, Including The Present Litigation
Following these revelations, Shanni filed claims with the New Jersey Client Protection Fund ("the Client Fund") on behalf of the estates of Kathryn and Anne Spencer. In support of those claims, Shanni cited Bergstein's sworn acknowledgment that Gavin had misappropriated funds from the estates. The Client Fund eventually paid $322,570 to the estates, a sum which did not fully reimburse them for the total amounts stolen by Gavin.[13]
Plaintiffs brought the present lawsuit in the Law Division in 2000. Initially, the complaint named fourteen defendants, including Gavin and his Estate, Bergstein, Bergstein's parents, Foster, Delgado, Delgado's husband Steven Moriarity, Averna, Averna & Gardner, Esqs., and the Bank. The complaint also named Heritage Antiques and Appraisal Services, an appraisal company, its owner Suzy Anderson, and the Western Surety Company. Plaintiffs amended their complaint twice, in respects not germane to this appeal.[14]
Averna was named in twelve counts of the complaint, including claims of conversion (Count One), breach of contract (Count Five), breach of fiduciary duty/accounting (Count Six), gross negligence/misconduct/waste (Count Seven), attorney malpractice (Count Eight), common law fraud (Count Nine), fraudulent concealment (Count Ten), conspiracy (Count Eleven), unjust enrichment (Count Thirteen), mail and wire fraud (Count Fourteen), federal RICO claims, see 18 U.S.C.A. §§ 1962, 1964 (Count Sixteen), and New Jersey RICO claims, see N.J.S.A. 2C:41-2 and -4, (Count Seventeen).
In his answer Averna denied each of these allegations. He also filed cross-claims for contribution and indemnification from the co-defendants, in the event he was found liable on any basis.
The Bank was named as a defendant only in Count Twelve. That Count alleged that the Bank "had improperly and/or negligently and/or willfully and/or intentionally and/or with gross negligence allowed and assisted [the Gavin defendants] in *1061 their activities. . . ." The Bank denied this contention.[15]
Averna filed a motion for summary judgment in January 2003, which the judge denied as premature. After a lengthy discovery period supervised by a Discovery Master, Averna filed a second motion for summary judgment in October 2005. The motion was heard by a different Law Division judge, who succeeded the judge who had denied Averna's initial motion.[16]
Following oral argument on Averna's renewed summary judgment motion, the motion judge issued an oral ruling on December 16, 2005, granting the application. Among other things, the motion judge found that "[t]he undisputed facts show that any injuries sustained by plaintiffs were caused by parties other than the Averna [defendants], namely the defendant[s] Daniel and Roberta Gavin." The judge further determined that "[p]laintiffs have not established any attorney/client relationship between [Averna] and plaintiffs, nor identified any duty owed by [Averna] to them." The judge noted that while "there may be a moral responsibility" of an attorney to report wrongdoing by another attorney to the authorities, that obligation "does not necessarily lead to legal responsibility" for those criminal acts.
Additionally, the motion judge found "absolutely no evidence" that Averna knew or was aware that Gavin "was stealing anything or pillaging the estates." The judge also criticized plaintiffs for failing to tender a timely expert report supporting their claims against Averna. Consequently, the judge entered an order on that same date granting summary judgment to Averna.
Plaintiffs moved for reconsideration of the court's dismissal of their claims against Averna. Averna cross-moved for attorneys fees and sanctions under R. 1:4-8 and N.J.S.A. 2A:15-59.1, contending that plaintiffs' claims against him had been frivolously advanced. Meanwhile, the Bank separately moved for summary judgment.
On February 17, 2006, the motion judge heard the motions for reconsideration and summary judgment. Following that hearing, the judge denied plaintiffs' motion for reconsideration as to their claims against Averna. During the course of his bench ruling, the judge observed that "in my estimation an attorney does not have an obligation to be a police officer." The judge reiterated that plaintiffs had failed to establish that Averna breached any legal duty to them.
On that same date, the motion judge likewise granted summary judgment to the Bank, determining that the Bank did not breach any fiduciary or contractual duties to plaintiffs. The judge noted that plaintiffs' theories of liability against the Bank on these facts simply were not viable. If such theories were accepted, the judge reasoned, "it would impose a duty on banks which would be absolutely impossible for them to comply with."
Lastly, on March 3, 2006, the motion judge denied Averna's application for sanctions and attorneys fees. In doing so, the judge underscored that the first judge on the case had denied Averna's initial motion for summary judgment in 2003, thereby reflecting that there was "sufficient reason here to bring this lawsuit." The judge *1062 further commented that he thought plaintiffs had made a "good argument," but that much of the evidence they had offered was not admissible.
As for the other defendants, summary judgment was entered against Bergstein and her mother, Edna Bergstein, for their individual roles in the misappropriation of plaintiffs' estates. At the same time, the claims against Gavin and the Gavin Estate were dismissed pursuant to a settlement agreement.[17] Plaintiffs also voluntarily dismissed their claims against Foster and the remaining defendants. The motion judge also dismissed Averna's cross-claims for indemnification and contribution against the settling defendants.
Plaintiffs have appealed the summary judgments respectively entered in favor of Averna and the Bank. With respect to Averna, plaintiffs argue that, as a matter of law, Averna owed a duty to the estates, and that he breached that duty. Plaintiffs further argue that the motion judge improperly rejected a report from a liability expert that they had tendered in opposition to Averna's motion. Alternatively, plaintiffs argue that even if they cannot prove a breach of duty on Averna's part, he is independently liable to them by virtue of a so-called "de facto partnership" that he formed with Gavin.
Plaintiffs further maintain on appeal that the Bank should not have been dismissed, because it allegedly breached its duties to the estates as depositors. Plaintiffs contend that the Bank is liable for their losses because it either had actual knowledge of Gavin's thefts, or it acted in bad faith in processing his fraudulent transactions. According to plaintiffs, the transactions should have been recognized by the Bank's personnel as being irregular and suspicious, and should not have been processed.
Averna cross-appeals the motion judge's denial of counsel fees and sanctions. Averna also requests that, in the hypothetical event that plaintiffs' claims against him are restored on appeal, the court should reinstate his cross-claims against the other defendants.
We now turn to the substance of these arguments, particularly focusing upon the significant issues of legal duty that are implicated here.

II.
The presence or absence of an enforceable duty is generally a question of law for the court. Clohesy v. Food Circus Supermkts., Inc., 149 N.J. 496, 502, 694 A. 2d 1017 (1997); see also Doe v. XYC Corp., 382 N.J.Super. 122, 140, 887 A.2d 1156 (App.Div.2005). The court's role in defining the contours of a legal duty is particularly important in the context of attorney conduct, as our State judiciary, since 1947, has exercised exclusive constitutional authority over the practice of law. See N.J. Const. art. VI, § 2, ¶ 3.
"Whether a duty exists is ultimately a question of fairness." Goldberg v. Housing Auth. of Newark, 38 N.J. 578, 583, 186 A. 2d 291 (1962) (emphasis omitted). "The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." Ibid.
We have routinely applied these principles in determining whether an attorney owed a duty that would subject him or her to civil liability if the duty were breached, including several cases involving estates. *1063 See, e.g., Estate of Albanese v. Lolio, 393 N.J.Super. 355, 375, 923 A.2d 325 (App. Div.) (holding that an attorney handling an estate owes a duty to make clear to an executrix that he is not representing her personal interests as a beneficiary of the decedent's will), certif. denied, 192 N.J. 597, 934 A.2d 639 (2007); Estate of Fitzgerald v. Linnus, 336 N.J.Super. 458, 471, 765 A.2d 251 (App.Div.2001) (holding that principles of fairness did not require the imposition of a duty upon an estate's attorney to provide beneficiaries with post-mortem estate planning, absent special circumstances); Albright v. Burns, 206 N.J.Super. 625, 632-33, 503 A.2d 386 (App. Div.1986) (holding that an attorney owed a duty to innocent parties when he knowingly facilitated improper transactions for the holder of a decedent's power of attorney); Barner v. Sheldon, 292 N.J.Super. 258, 261, 678 A.2d 767 (Law Div.1995) (finding that an attorney handling an estate owed no duty to the estate's beneficiaries, where their interests were adversarial to the estate and were contrary to the will of the testator), aff'd, 292 N.J.Super. 157, 678 A.2d 717 (App.Div.1996).
In the present case, the motion judge determined that Averna, as an attorney, had no duty to report Gavin's misappropriations of client property, even if it were proven that Averna knew about those thefts. Because the judge's determination of the absence of such a duty is a conclusion of law, we assess his ruling under a de novo standard of review, without according any special deference to the judge's legal interpretation. See Manalapan Realty v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995); see also Albanese, supra, 393 N.J.Super. at 366, 923 A.2d 325. Moreover, in considering the facts and circumstances that pertain to these issues, we accord all legitimate inferences from the record to plaintiffs, who were the non-moving parties on defendants' applications for summary judgment. See R. 4:46-2(c); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995); see also Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div.), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998).

A.
The scope of a lawyer's potential duty essentially has two facets: (1) the persons or entities to whom that duty is owed, and (2) the conduct required of the lawyer to fulfill the duty. Here, because the motion judge determined that Averna owed no legal duty to plaintiffs with respect to Gavin's thefts, the judge did not reach the related question of what, if any, steps Averna should have undertaken upon allegedly learning of the wrongdoing.
We begin our own analysis with a recognition that a lawyer has a fundamental duty of loyalty to his or her clients. In re Educ. Law Ctr., Inc., 86 N.J. 124, 133, 429 A.2d 1051 (1981); In re Dolan, 76 N.J. 1, 9, 384 A.2d 1076 (1978). "The attorney-client relationship embodies the concept of the client's trust in his [or her] fiduciary, the attorney." In re Loring, 73 N.J. 282, 289, 374 A.2d 466 (1977).
"All fiduciaries are held to a duty of fairness, good faith and fidelity, but an attorney is held to an even higher degree of responsibility in these matters than is required of all others." In re Honig, 10 N.J. 74, 78, 89 A.2d 411 (1952). "`[F]ew [obligations are] more anxiously guarded by the law, or governed by sterner principles of morality and justice[.]'" Loring, supra, 73 N.J. at 289, 374 A.2d 466 (quoting Stockton v. Ford, 52 U.S. (11 How.) 232, 247, 13 L.Ed. 676, 683 (1850)); see also R.P.C. 1.7 (prohibiting conflicts of interests involving concurrent clients); *1064 R.P.C. 1.8 (prohibiting specified lawyer-client conflicts).[18]
A lawyer's duty of loyalty can extend beyond the time when his or her representation of a client has concluded. State v. Loyal, 164 N.J. 418, 429-34, 753 A.2d 1073 (2000) (attorney prohibited from representing a criminal defendant in a trial where a prosecution witness was the attorney's former client); Procanik v. Cillo, 206 N.J.Super. 270, 291, 502 A.2d 94 (Law Div.1985), (recognizing an attorney's post-termination duties to a civil client), rev'd on other grounds, 226 N.J.Super. 132, 543 A.2d 985 (App.Div.), certif. denied, 113 N.J. 357, 550 A.2d 466 (1988); see also R.P.C. 1.9 (generally prohibiting conflicts of interests with a former client, and prohibiting a lawyer's use of information related to the representation to a former client's disadvantage).
Moreover, apart from the duty of loyalty, an attorney's fiduciary role includes an affirmative obligation to act in, and to look out for, a client's best interests. When the attorney is still representing the client, the attorney must act with "reasonable diligence and promptness," R.P.C. 1.3, and with a degree of skill and competence that comports with reasonable professional standards. See R.P.C. 1.1; see also Conklin v. Hannoch Weisman, 145 N.J. 395, 416, 678 A.2d 1060 (1996); Carbis Sales, Inc. v. Eisenberg, 397 N.J.Super. 64, 78, 935 A.2d 1236 (App.Div. 2007). The attorney also must communicate to the client information that the client needs to know. See Stoeckel v. Twp. of Knowlton, 387 N.J.Super. 1, 14, 902 A.2d 930 (App.Div.) (allowing a cause of action for malpractice against a real estate lawyer who allegedly had not alerted his client to the risks of closing title), certif. denied, 188 N.J. 489, 909 A.2d 724 (2006); see also R.P.C. 1.4.
As we have recognized, an attorney's duties to a current or former client are not boundless. For example, with a client's informed consent, the attorney may limit the scope of his or her representation. See Lerner v. Laufer, 359 N.J.Super. 201, 217, 819 A.2d 471 (App. Div.), certif. denied, 177 N.J. 223, 827 A.2d 290 (2003); R.P.C. 1.2(c). Likewise, a private client may consent to certain conflicts of interest. See In re Supreme Court Advisory Comm. on Prof'l Ethics Opinion No. 697, 188 N.J. 549, 558-59, 911 A.2d 51 (2006); see also R.P.C. 1.7(b)(1); R.P.C. 1.8(a)(3); R.P.C. 1.9(a).[19]

B.
A threshold issue here is the identity of Averna's client or clients when, at Gavin's request, Averna furnished legal services from June through September 1994 in creating the Spencer Foundation, and in drafting a construction contract between the Foundation and Laycock in September 1994. Averna maintains that he was never retained by any of the plaintiff estates, and that he therefore owed no duties to them. We reject that myopic contention, for several reasons.
First, we note that Averna prepared the instruments forming the Spencer Foundation in accordance with a specific recital in Kathryn's will, in which Kathryn directed *1065 that her designated trustee "create and fund a non-profit corporation to be known as The Spencer Foundation for all permitted charitable purposes." Kathryn further instructed in her will that the Foundation would receive two-fifths of the undistributed balance of her estate.
Averna emphasizes that both of his invoices for the work in question were directed to the Spencer Foundation. He therefore contends that his sole client in the two matters was the Foundation. We do not conceive of Averna's professional role on those matters that narrowly.
The two checks that Averna received for the legal work, one issued in July 1994 and the second in October 1994, were drawn on bank accounts of Kathryn's estate. The checks were signed by Gavin, Kathryn's executor. Averna's bills were sent to Gavin, at the same address where both men worked. During the course of his initial project in forming the Foundation, Averna's client could not have been the Foundation, since it did not yet exist. If, for some reason, Averna had been unsuccessful in forming the Foundation, he would still have had a client or clients to whom he was accountable while he was attempting that undertaking.
As we have recognized, a lawyer representing an organization may, in some circumstances, have an attorney-client relationship with the constituents of that organization. See, e.g., Petit-Clair v. Nelson, 344 N.J.Super. 538, 543-44, 782 A.2d 960 (App.Div.2001) (lawyer who represented two closely-held corporations in litigation was also deemed, under the circumstances presented, to have represented the corporations' individual owners). It is thus entirely possible for Averna to have represented the interests of the Foundation's constituents, other related persons or entities, as well as the Foundation.
The record does not contain a retention agreement that might have shed light upon who Averna represented when he formed the Foundation in mid-1994 and drafted the construction contract later that fall. Apart from the Foundation itself, the conceptual possibilities include (1) Gavin, as Kathryn's executor, (2) her estate, (3) the beneficiaries of her estate, or (4) some combination of those alternatives.
Our case law has recognized that there can be several variations in identifying whom a lawyer represents in an estate matter. We are mindful that in Barner, supra, 292 N.J.Super. at 265, 678 A.2d 767, the Law Division held that, in general, when a lawyer is retained by an executor to perform specific tasks in connection with an estate, "[the] attorney's client is the executor of the estate, not the estate itself." We are equally mindful that we affirmed that particular holding. A superficial reading of Barner might thus suggest that Averna's only other potential client when he worked on the two Foundation matters was Gavin, since Gavin was the executor of Kathryn's estate.
The law, however, is more nuanced than that. Barner's general proposition that a lawyer only represents the estate's fiduciary, and not the estate itself, is often qualified. We recognize that in certain scenarios, a lawyer doing work on an estate may represent only the estate. In other situations, the lawyer may represent both the estate itself and its executor or administrator.
By way of illustration, in Fitzgerald, supra, 336 N.J.Super. at 462, 765 A.2d 251, an executrix retained a lawyer "to aid her in administering [the] decedent's estate." (Emphasis added.) The lawyer's retainer agreement, however, specified that the lawyer and his firm had been "retained to represent the estate." Ibid. (Emphasis added.) When the lawyer failed to provide *1066 the executrix with estate planning advice, causing her own children to sustain adverse tax consequences, the executrix sued the lawyer. Id. at 463, 765 A.2d 251.
On the facts presented, we held that the lawyer in Fitzgerald had no duty to represent the interests of the decedent's children as beneficiaries of the estate. Id. at 472, 765 A.2d 251. However, we recognized "the possibility that circumstances might arise where an attorney would have such a duty" to beneficiaries. Ibid. See also Barner, supra, 292 N.J.Super. at 261-66, 678 A.2d 767 (positing that such a duty may be owed to beneficiaries "in an egregious situation" such as fraud, collusion or malice, or where a separate duty to those beneficiaries has been undertaken). Because the focus of Fitzgerald, supra, 336 N.J.Super. at 472, 765 A.2d 251, centered on decedent's children, in their capacities as beneficiaries of the executrix, we did not need to consider specifically in that case whether the attorney had represented the executrix and the estate itself, as dual clients.
As another illustration of these varying client arrangements, the Chancery Division held in In re Estate of Fedor, 356 N.J.Super. 218, 222, 811 A.2d 970 (Ch.Div. 2001), that "an attorney for [an] estate does not represent the beneficiaries as clients but only represents the estate." (Emphasis added.) The court in Fedor specifically found that the estate's attorney there did not represent the fiduciaries who had previously managed the estate, and who had subsequently been replaced by a temporary trustee. Id. at 219-20, 811 A.2d 970.
More recently, in Albanese, supra, 393 N.J.Super. at 360-62, 923 A.2d 325, we were presented with a scenario in which an attorney's retainer letter was ambiguous as to whether he and his law firm would represent only the estate itself or would also represent the individual interests of the executrix as a beneficiary of the estate. Given the retainer agreement's lack of clarity, we found that the executrix could have harbored a reasonable expectation that the attorney would also serve her individual interests. Id. at 374-75, 923 A.2d 325. On the other hand, we rejected the claim that two sisters of the executrix, who also were beneficiaries of the estate, had reason to expect that the attorney owed them any duties individually. Id. at 375-77, 923 A.2d 325.
In the course of our analysis in Albanese, we alluded to the prior observations in Barner and Fitzgerald that an attorney retained for an estate "generally" represents the executor or executrix as a fiduciary, and not the estate as an entity. Id. at 374, 923 A.2d 325. As exemplified by Albanese, that general proposition is subject to exceptions, so that the attorney in Albanese could have owed duties to both the estate and to the executrix. Id. at 374-75, 923 A.2d 325.
We need not address in this opinion all of the many potential variants of a lawyer's representation that may exist in the context of estate work. We only need to examine whether Averna, in light of all of the circumstances, had a sufficient nexus to one or more of the plaintiff estates to trigger an attorney-client relationship.
We are satisfied that Averna had an attorney-client relationship with the Estate of Kathryn Spencer between the months of June and September 1994. Such an attorney-client relationship is supported by several facts and circumstances. First, the Foundation that Averna formed was created pursuant to a specific bequest in Kathryn's will, one that would control a substantial portion of the residual assets in her estate. Second, Averna was paid for his services out of the estate's bank accounts. *1067 Third, the estate benefited, at least indirectly, from Averna's work.[20] Fourth, the executor of the estate, Gavin, was clearly not a responsible fiduciary, but instead was a thief who repeatedly stole estate funds and property. Fifth, Averna did not formalize his retention with any written agreement confining his representation solely to the Foundation, or to the executor.
In recognizing an attorney-client relationship with Kathryn's estate, we are cognizant that Averna was paid only modest amounts by Kathryn's estate for the legal work that he performed. Even so, the quantum of a lawyer's fees is not dispositive of the presence or absence of an attorney-client relationship and the professional duties attendant to such a relationship. See Educ. Law Ctr., supra, 86 N.J. at 133-34, 429 A.2d 1051.
It is less obvious whether Averna had an attorney-client relationship with the two other plaintiff estates. One might consider the three estates so financially and otherwise intertwined, with Gavin serving as their common executor and administrator, that Averna's attorney-client relationship ought to extend to all three plaintiffs. We need not go that far, at least for the purposes of deciding the question of whether Averna had a duty to report Gavin's thefts.[21]
Even if the other two Spencer estates, or for that matter, all three estates, were classified as "non-clients," our law recognizes that a lawyer may at times owe duties to a third party who is not his or her client. In Petrillo v. Bachenberg, 139 N.J. 472, 479-80, 655 A.2d 1354 (1995), the Supreme Court held that an attorney may be liable to a non-client in certain situations where the attorney knows, or should know, that the non-client will rely on the attorney. See also Davin, LLC v. Daham, 329 N.J.Super. 54, 76, 746 A.2d 1034 (App.Div.2000) (finding that a lessor's attorney had a duty to lessees to disclose the fact that the property was in foreclosure proceedings); Atl. Paradise Assocs., Inc. v. Perskie, Nehmad & Zeltner, 284 N.J.Super. 678, 684, 666 A.2d 211 (App. Div.1995) (finding that an attorney could be liable to non-clients for misrepresentations in a public offering statement), certif. denied, 143 N.J. 518, 673 A.2d 276 (1996).
Here, the Spencer estates all implicitly relied[22] upon Averna to be faithful to their best interests, and to not turn a blind eye if he learned that the executor was plundering estate funds. We have no difficulty, conceptually or otherwise, in finding that Averna had a duty to report such circumstances of wrongdoing if he indeed knew about it.

C.
Our conclusion that Averna owed a duty to report Gavin's misdeeds, assuming for *1068 the sake of argument that he actually knew of them, is buttressed by two other significant factors. One of those factors is circumstantial, and the other is legal.
The circumstantial factor grows out of Averna's close and regular working relationship with Gavin. Averna was not retained to work on Kathryn's estate and her desired Foundation out of the blue. As we have noted, Averna worked for three years in Gavin's building. Gavin referred Averna about ten to fifteen cases during that time. They agreed to share fees on those cases. Averna inherited Gavin's former paralegal, as well as his former personal office. Other lawyers in the building perceived that Gavin was grooming Averna to take over his practice.
Averna's malpractice carrier was even sent a letter, under Averna's apparent signature, announcing the formation of a new partnership that included Gavin. Although Averna essentially claims that he was only on the fringes of the Spencer estates, his close and sustained nexus to Gavin's law practice reinforces the fairness of imposing certain duties upon him as a consequence of that proximity.
That being said, we are unpersuaded from the record that Gavin and Averna entered into what plaintiffs characterize as a "de facto partnership." The requisite elements to establish such a partnership are not all present. In particular, there is inadequate proof that Gavin and Averna exercised joint control over a common business. See Carney v. Hansell, 363 N.J.Super. 111, 121, 831 A.2d 128 (Ch.Div. 2003). Although Gavin referred specific files to Averna, and Averna agreed to share the fees those files generated, the referrals do not reflect that there was "`a community of interest in the profits or losses'" in Gavin's law practice as a whole. See Bloom v. Clara Maass Med. Ctr., 295 N.J.Super. 594, 610, 685 A.2d 966 (App. Div.1996) (quoting Farris v. Farris Eng'g Corp., 7 N.J. 487, 498-99, 81 A.2d 731 (1951)).
For example, there are no bank statements showing that Gavin and Averna co-mingled the revenues or disbursements from their law practices. Nor are there any documents showing that Averna was paid a share of the overall profits, if any, of Gavin's practice. As far as we can tell from the record, the two lawyers did not make any common investments or take on any indebtedness together. The September 1994 letter to Averna's malpractice carrier, although it certainly reflects a plan for Gavin and Averna to become law partners, did not result in any follow-up action creating a new law firm. In fact, Gavin's practice was not assumed upon his death by Averna, but instead was taken over by Foster.
For these various reasons, we affirm the motion judge's discrete finding that plaintiffs failed to present genuine and material questions of fact as to the existence of a de facto partnership. Brill, supra, 142 N.J. at 540, 666 A.2d 146.[23] *1069 Averna thus is not vicariously liable, at least as a matter of contract and partnership law, for Gavin's misdeeds. Even so, for the reasons we have already noted, Averna's relationship with Gavin did not have to rise to the level of a de facto partnership in order to trigger a duty on his part to disclose Gavin's thefts.

D.
A second factor enhancing our conclusion that Averna owed a legal duty to speak up, assuming he knew of Gavin's thefts of client property, emerges from the Rules of Professional Conduct. Specifically, the Rules require that:
[a] lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority.

[R.P.C. 8.3(a) (emphasis added).]
Under the terminology section of the RPCs, the concept of "knowledge" is defined narrowly:
"Knowingly," "known," or "knows" denotes actual knowledge of the fact in question. A person's knowledge may be inferred from the circumstances.
[R.P.C. 1.0(f).]
Although plaintiffs advanced a more ambitious theory in their pleadings, they have clarified on appeal that they are only asking the court to recognize a duty on Averna's part to report Gavin's thefts if it is proven that he had, at the relevant time, actual knowledge of Gavin's wrongdoing.[24]
Applying the precepts of R.P.C. 8.3(a) here, we are satisfied that if Averna had actual knowledge that Gavin was repeatedly siphoning money and property from the plaintiff estates, such an awareness would amount to a serious professional breach that raises "a substantial question as to [Gavin's] honesty, trustworthiness or fitness as a lawyer." Ibid. Accordingly, Averna would have had a professional obligation, owed not only to his clients but to the public at large, to bring Gavin's thefts to light.
In citing R.P.C. 8.3(a), we heed the Supreme Court's admonition in Baxt that violations of the RPC's are not to be treated as per se grounds for an attorney's civil liability. See Baxt, supra, 155 N.J. at 198-200, 714 A.2d 271. Nonetheless, a failure by Averna to abide by his professional reporting duties under R.P.C. 8.3(a) only strengthens our conclusion that such inaction exposes him to civil liability to those who were harmed by his silence.

E.
In sum, we hold that an attorney such as Averna who has a close and interdependent business relationship with another lawyer, and who is performing legal work for a common client at that lawyer's request, has a duty to report that lawyer if he or she develops actual knowledge that the lawyer has been stealing funds from their common client. The motion judge erred, as a matter of law, in rejecting that principle. The evidence in the record, particularly *1070 Marcolini's[25] pointed testimony that Averna told her about Gavin's "raping and pillaging" of the estates, raises genuine factual issues as to what Averna knew and when he knew it. Consequently, a trial is required.
As a matter of policy, we discern no unfairness in a rule of law that imposes a duty upon a lawyer in Averna's shoes to blow the whistle on his or her professional peer. See Goldberg, supra, 38 N.J. at 583, 186 A.2d 291 (the question of duty turns on principles of fairness). A lawyer with such actual knowledge must take action to safeguard each client's interests. Clients, as well as the public at large, deserve no less from the bar.
We appreciate that reporting a fellow attorney is not easy or pleasant, and that filing such a report may involve professional and personal repercussions. But the integrity of the profession and the protection of clients cannot be sacrificed for expediency.
Lest our opinion be read too broadly or otherwise misapplied, we stress that we are not declaring that a lawyer who receives a routine, arms-length referral from another lawyer automatically exposes himself or herself to civil liability if he or she fails to intercede after learning that the referring lawyer has somehow harmed a client. Instead, we limit our recognition of an attorney's reporting duty to the distinctive facts and circumstances that are presented in this case. We decide no more than that today.

F.
Having recognized this discrete obligation, we next turn to considering what the lawyer with such a duty must do to fulfill it. Plaintiffs suggest to us that, for purpose of civil liability, the duty in question entails an obligation to report the dishonest lawyer to the Office of Attorney Ethics ("OAE"). Alternatively, one might conceive of the duty as a responsibility to report the other lawyer's thefts to the police or some other law enforcement agency. We also have considered whether, at least as a preliminary step, a lawyer with knowledge of such wrongdoing should first inform the affected client or clients, although in the present case that step would have been pointless, in light of Gavin's status as executor or administrator of all three estates.
Without deciding the issue definitively, we are inclined to favor an approach that would require an attorney in these circumstances to advise the OAE, and, if feasible, the affected client, of the other lawyer's misconduct. The OAE and the client would then have the opportunity to apprise law enforcement agencies of the wrongdoing, and to take immediate precautions to prevent the further siphoning of the client's assets.[26]
In any event, it is undisputed in the present case that Averna did none of these things. His defense, which may be proven or disproven at trial, is that he simply did not possess actual knowledge that Gavin was absconding with funds or other property from the plaintiffs' estates. This genuine issue of material fact as to Averna's knowledge must be tried on remand, with the jury making the necessary *1071 credibility determinations. Brill, supra, 142 N.J. at 540, 666 A.2d 146. In resolving that issue, the jury may consider circumstantial proof of Averna's state of mind. See R.P.C. 1.0(f) ("A person's knowledge may be inferred from circumstances."); see also In re Cavuto, 160 N.J. 185, 195-96, 733 A.2d 1174 (1999) (circumstantial evidence relevant in showing that the attorney knew of the misappropriation of client funds).
On remand, the factfinder must also resolve other key issues that remain, including questions of proximate causation and damages. See Fitzgerald, supra, 336 N.J.Super. at 467, 765 A.2d 251 (in a professional liability case against an attorney, a plaintiff must show not only the breach of a duty of care, but also the damages proximately caused by that breach). As a matter of timing, we note that the record suggests that the withdrawals from the estates' bank accounts orchestrated by Gavin took place between July and December 1994. The period of Gavin's wrongdoing may have started sooner than that. It also may also have continued beyond December 1994, possibly up to the time of his death in February 1995. Meanwhile, Averna worked in Gavin's building during that whole time frame, and, in particular, performed legal work between June and September 1994 in creating the Foundation and drafting the construction contract.
At trial, plaintiffs will need to pinpoint when, if ever, Averna developed actual knowledge that Gavin was stealing from the Spencer estates. If, hypothetically, Averna did not obtain that awareness until after Gavin's misdeeds had substantially progressed or had ended altogether, Averna still might be liable for a portion of the estates' losses.[27] Plaintiffs then would have to demonstrate that Averna's failure, once he learned the critical facts, to make a prompt report caused the pilfered assets to be dissipated in the interim.
Such open issues of causation and damage are plainly amenable to expert testimony. See N.J.R.E. 702; Froom v. Perel, 377 N.J.Super. 298, 314, 872 A.2d 1067 (App.Div.) (concerning expert testimony to prove proximate causation in a legal malpractice case), certif. denied, 185 N.J. 267, 883 A.2d 1063 (2005). We recognize that plaintiffs did tender a liability expert report, after the discovery deadline in this case had already passed. We also bear in mind the judge's understanding at that time of the applicable substantive law, and his mistaken perception that Averna did not have a legal duty to report Gavin's thefts. See R. 4:24-1(c) (discovery only should be extended for good cause or, if sought after a trial date has been set, upon a showing of exceptional circumstances).
Nonetheless, in light of our clarification in this opinion of the legal principles involved, as to the existence and scope of Averna's potential duty, we believe it is in the interests of justice to afford both plaintiffs and defendants a renewed opportunity on remand to marshal expert testimony on those issues. Such expert testimony may assist the jury in addressing the unresolved and pivotal issues of liability in a manner tailored to the legal standards that we expressed today. Although Averna's potential duty to report Gavin's wrongdoing is a logical extension of principles embedded in past case law and the Rules of Professional Conduct, we appreciate that counsel might not have envisioned that duty in the same way when they first consulted, or considered consulting, expert witnesses for this litigation. Consequently, we believe it is fairest to afford both parties a chance to refine their trial proofs, including expert testimony, on remand. *1072
We therefore vacate the motion judge's oral ruling of December 2, 2005 barring plaintiffs' expert testimony on liability issues. We remand the case to allow the parties to conduct an appropriate interval of supplemental discovery, with the exchange, if the parties so choose, of new or amended expert reports. The parties and their experts shall not be permitted, however, to relitigate this court's legal conclusions recognizing Averna's duty to report Gavin's thefts if he had actual knowledge of them. The experts may instead address the residual issues, such as the presence and the extent of a breach, and whether such a breach resulted in any financial harm to the plaintiffs.
For all of these reasons, we vacate the motion judge's orders dated December 2, 2005 and February 17, 2006, insofar as they granted summary judgment to Averna on plaintiffs' claims of breach of fiduciary duty, and foreclosed the presentation of expert proof concerning Averna's potential liability.[28] All other claims asserted by plaintiffs remain dismissed.[29]

G.
Lastly, having revived plaintiffs' claims against Averna, we consider Averna's provisional request that his cross-claims for indemnification against the settling defendants, Gavin and the Estate of Gavin, should also be reinstated. In his pleadings, Averna asserted cross-claims against the co-defendants on two distinct grounds: (1) contribution under the Joint Tortfeasors Contribution Act, N.J.S.A. 2A:53A-1 to -5, and (2) indemnification. Because Gavin and his estate have settled with plaintiffs, Averna's cross-claims against them for contribution have been extinguished. Averna may, however, be entitled to an appropriate credit recognizing the fault of the settling defendants, as an offset from a judgment obtained against him by plaintiffs on remand. See Young v. Latta, 123 N.J. 584, 595-98, 589 A.2d 1020 (1991).
Averna does not contest such a disposition of his contribution claims. He solely appeals the motion judge's ruling to dismiss his cross-claims for indemnification against the settling defendants. We agree that those claims were properly dismissed. Averna has no contractual right of indemnification from Gavin or his estate. See Mantilla v. NC Mall Assocs., 167 N.J. 262, 266-67, 770 A.2d 1144 (2001). Averna also fails to demonstrate any right of common-law indemnification against those parties.
Nothing in the record establishes a sufficient legal relationship between Averna and Gavin to support a duty to indemnify. Averna incorrectly likens his role to that of an employer or master who is being charged with the torts of his servant, see, e.g., Hagen v. Koerner, 64 N.J.Super. 580, 584, 166 A.2d 784 (App.Div.1960), but that analogy simply does not fit the facts and circumstances here. Averna was not Gavin's master or employer. Nor were the two men partners. Averna's liability, if it is proven on remand, arises from his own independent breach of a duty, not from the application of principles of vicarious responsibility. See Adler's Quality Bakery, Inc. v. Gaseteria, Inc., 32 N.J. 55, 80, 159 A.2d 97 (1960).
We therefore affirm the dismissal of Averna's cross-claims for indemnification from Gavin and his estate.

*1073 III.
[At the direction of the court, the published version of this opinion omits Part III, which addresses the motion judge's grant of summary judgment to the Bank. See R. 1:36-3.]

IV.
In conclusion, we vacate the Law Division's orders granting summary judgment to Averna, and remand for further proceedings consistent with our opinion. Summary judgment in favor of the Bank is affirmed. Averna's cross-appeal for sanctions is dismissed, and his provisional cross-appeal to reinstate his indemnity claims against the settling co-defendants is denied.
NOTES
[1] Inadvertently omitted from the briefs filed by appellants' counsel of record.
[2] For simplicity, we shall refer to Roberta Gavin as "Bergstein."
[3] The record indicates that Michael Gardner, who is not named as a defendant, was not frequently present in Gavin's building, and that, unlike Dean Averna, he did not have a close relationship with Gavin and did not perform legal work on any of the plaintiff estates. Plaintiffs' complaint nonetheless names the law firm of Averna & Gardner, Esq., as co-defendant with Averna. For ease of reference, we shall use the term "Averna" to refer to either Dean Averna or his law firm, depending on the context.
[4] Because Averna admitted at his deposition that neither he nor Gavin was a certified trial attorney, such fee-sharing appears to have violated R.P.C. 1.5(e) and R. 1:39-6(d). Plaintiffs do not predicate a cause of action upon such violations in their pleadings, so we do not comment further on the propriety of the fee-sharing.
[5] Even so, it does appear that the signature on the letter closely resembles Averna's signature on his certifications.
[6] The record does not enlighten us as to why Anne Spencer's estate was still open in 1994, thirty-four years after her death, and why Madeline King's estate was still open nine years after her own demise.
[7] The record lacks, however, any documentation formalizing Gavin's appointment as the substitute administrator for Madeline's estate.
[8] We recognize that, if and when this case is tried, these out-of-court statements may be inadmissible hearsay. On the other hand, some or all of the statements might be admissible for non-hearsay purposes, see N.J.R.E. 801(c), or under applicable hearsay exceptions. See N.J.R.E. 803, 804. These admissibility issues are reserved for the trial court after appropriate objections or in limine motions.
[9] The same church was separately named as a beneficiary in Kathryn's will. The will also identifies several persons as beneficiaries.
[10] Indeed, plaintiffs do not contend in this appeal that Averna stole client funds, but rather that his culpability arises from his failure to act on his alleged knowledge of Gavin's thefts.
[11] The record does not explain why Foster, rather than Averna, ended up taking over Gavin's practice.
[12] The First State Bank thereafter became the Independence Community Bank, and subsequently was acquired by Sovereign Bank. Sovereign Bank ("the Bank") is a co-defendant in this case, as a successor to the First State Bank.
[13] At oral argument before us, plaintiffs' counsel estimated that, with interest, the total damages to the estates arising from Gavin's thefts are approximately $700,000.
[14] One of those amendments added Sandra Gonzalez, allegedly another legal secretary and/or receptionist for Gavin, as a named defendant.
[15] We do not discuss the substance of plaintiffs' claims against the remaining defendants, who have either settled, been voluntarily dismissed, or found liable on summary judgment.
[16] We hereafter refer to the second Law Division judge assigned to this case as "the motion judge."
[17] We were advised at oral argument of the amount of the settlement. The figure is not germane to our analysis, except to note that the settlement, even when combined with the recovery from the Client Fund, does not make the estates whole.
[18] Although we cite herein to several relevant Rules of Professional Conduct, we are mindful that the RPCs are only evidential, and that an attorney's violation of an RPC does not automatically lead to civil liability. See Baxt v. Liloia, 155 N.J. 190, 193, 714 A.2d 271 (1998).
[19] These consent-based exceptions are inapplicable in this case, because there surely was no consent by any client to permit Averna to ignore acts of wrongdoing by Gavin.
[20] For example, the construction contract that Averna drafted was for repairs at the same church that Kathryn had separately designated as a beneficiary in her will.
[21] As they are not co-plaintiffs here, we need not consider whether the beneficiaries of the three estates, given their common interest in having the estate assets protected from theft, were also owed a duty by Averna. See Barner, supra, 292 N.J.Super. at 266, 678 A.2d 767 (certain "egregious" circumstances may warrant imposing on estate attorney a duty to beneficiaries).
[22] The concept of reliance extends, of course, to legal and business entities as well as to natural persons. See, e.g., First Am. Title Ins. Co. v. Lawson, 177 N.J. 125, 136-38, 827 A.2d 230 (2003) (insurance company's reliance on an insured's statements); In re Passaic County Utils. Auth., 164 N.J. 270, 274, 753 A.2d 661 (2000) (public entities' reliance on a solid waste regulatory system in assessing fees).
[23] We recognize that we previously held in a legal malpractice appeal, one involving a different plaintiff, that Averna was not liable for Gavin's failure to take timely action on that plaintiff's personal injury claim, because we found that Averna's law practice was distinct from Gavin's. See Lenches-Marrero v. The Law Firm of Averna & Gardner, 326 N.J.Super. 382, 384, 741 A.2d 605 (App.Div.1999).

Plaintiffs in the present case are not collaterally estopped by the findings in Lenches-Marrero because they were not a party to that lawsuit or in privity with that plaintiff. See Olivieri v. Y.M.F. Carpet, Inc., 186 N.J. 511, 521, 897 A.2d 1003 (2006) (reciting the well-established factors for collateral estoppel, including privity). In addition, the issues of malpractice involved in Lenches-Marrero, concerning a statute of limitations deadline negligently missed by Gavin, are entirely different from the legal duties implicated in the present appeal.
[24] We therefore do not have to reach the more difficult question of whether a lawyer in Averna's circumstances, who lacks actual knowledge that another lawyer is stealing from a common client, but who has reason to suspect such malfeasance, would be civilly liable for failing to report that other lawyer to the authorities or to take other remedial measures.
[25] Since Marcolini is not a defendant, we do not address whether she also had a duty to report Gavin's misdeeds. We do note her comparative lack of nexus to the plaintiff estates and the second-hand nature of her knowledge of Gavin's conduct.
[26] We by no means preclude the attorney from also notifying the police, if he or she chooses to do so.
[27] See R.P.C. 1.9 (noting that any attorney may owe ongoing duties to former clients).
[28] Our disposition reinstating plaintiffs' claims against Averna moots the need to address Averna's cross-appeal of the judge's ruling that the claims against Averna were not frivolous.
[29] We do not set aside, however, plaintiffs' unappealed judgment against Bergstein and her mother.